**FIRSTLINE TRANSPORTATION SECURITY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Akal Security, Inc., Intervenor-defendant.**

No. 11–375 C.

United States Court of Federal Claims.

Sept. 27, 2011.[1]

---

1. This opinion was issued under seal on August 10, 2011. Pursuant to ¶ 7 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. The court has accepted the majority of the parties' proposed redactions. Brackets ( [ ] ) identify the redacted portions of this opinion.

Bradley D. Wine, with whom were Tina D. Reynolds, David Y. Yang, and Jade C. Totman, Washington, DC, for plaintiff.

Shari A. Rose, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Washington, DC, for defendant.

Terrence M. O'Connor, with whom were Seth C. Berenzweig, John W. Polk, and Stephanie Wilson, McLean, VA, for intervenor-defendant.

## OPINION AND ORDER

BUSH, Judge.

FirstLine Transportation Security, Inc. (FirstLine) filed its post-award bid protest complaint on June 10, 2011. In its complaint, FirstLine challenges the award of a contract by the United States Department of Homeland Security, Transportation Security Administration (TSA) to Akal Security, Inc. (Akal), pursuant to Solicitation No. HSTS03–10–R–SPP032 (the RFP). The contract is for security screening services at Kansas City International Airport in Kansas City, Missouri (MCI) under the Screening Partnership Program (SPP). FirstLine seeks permanent injunctive relief setting aside the award to Akal and ordering TSA to award the contract to FirstLine. In the alternative, FirstLine requests that the court order TSA to hold further discussions with FirstLine and Akal and to allow them to submit revised proposals to be evaluated in accordance with the requirements of the RFP. Akal has intervened in this suit. FirstLine's bid protest is now before the court on cross-motions for judgment on the administrative record brought pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).

The administrative record (AR) of this procurement was filed by defendant on June 17, 2011. Defendant has agreed to stay performance of the contract until the court resolves this protest on the merits. The parties requested, and the court established, an expedited schedule for briefing of the parties' ·cross-motions for judgment on the administrative record. Oral argument was held on July 21, 2011. For the reasons discussed below, the court concludes that TSA's award decision was fundamentally flawed and must be set aside. Accordingly, the court hereby grants FirstLine's motion for judgment on the administrative record and denies defendant's and intervenor's cross-motions.

## BACKGROUND

### I. Factual Background

**A. The Aviation and Transportation Security Act and the Screening Partnership Program**

In November 2001, in response to the events of September 11, 2001, Congress enacted the Aviation and Transportation Security Act (ATSA), Pub.L. No. 107–71, 115 Stat. 597 (2001) (codified in scattered sections of 49 U.S.C.). *See* AR at 1. ATSA authorized the creation of TSA, a federal agency charged with primary responsibility for securing the nation's commercial airports, including the provision of comprehensive passenger and baggage screening services. *Id.*

Following an initial three-year pilot program conducted at five airports, TSA established the SPP, under which security screening services at designated airports would be

provided by private contractors instead of by TSA security officers. *Id.* SPP contractors provide the same security services usually provided by TSA, such as screening passengers and cargo (including both checked and carry-on baggage) for explosives, weapons, and other prohibited items before those passengers and cargo are allowed to enter the sterile area of the airport. *Id.* at 1–2, 31. Seventeen airports, including MCI, have elected to participate in the SPP. *Id.* at 1.

FirstLine is the incumbent SPP contractor at MCI and has been performing security screening services there since November 2002. *Id.* at 837, 880. FirstLine was awarded its current SPP contract at MCI on April 7, 2006. *Id.* at 405, 880. The 2006 contract was awarded for one base year plus four option years on a cost plus award fee basis, and had a total anticipated value of $173,120,739. *Id.* at 880. However, the 2006 contract expired on September 30, 2010, and FirstLine has performed security screening services at MCI since that time under short-term bridge contracts. *See* Pl.'s Mot. at 4 n. 3. The MCI contract is FirstLine's largest contract and accounts for approximately [ ] percent of its revenue.

### B. The Protested Procurement
#### 1. The Solicitation

On April 2, 2010, TSA issued the RFP, in which it requested proposals for contracts to perform SPP services at three airports, including MCI. *See* AR Tab 3. The new MCI contract would be for an initial base term of twelve months, plus four one-year options, on a fixed-price, award-fee basis. *Id.* at 22. Under the RFP, screening services at each airport would be provided by a single offeror, but a single offeror could be awarded a contract for more than one airport. *Id.* at 139.

For the base year of the contract, offerors were directed to propose prices for twelve months of performance, including no more than three months of transition activities and at least nine months of screening services.[2] *Id.* at 26. For each of the subsequent option

years, offerors were to propose prices for twelve months of screening services. *Id.* at 26–28. Finally, offerors were to propose award fees in accordance with guidelines set forth in the RFP. *See id.* at 26–28, 60–66. The successful offeror would be eligible for one award fee in the base year and two award fees in each of the option years. *Id.* at 26–28.

The RFP stated that the offerors' proposals would be evaluated, and the SPP contracts would be awarded, on a best-value basis:

> The Government will make the award decision(s) on a Best Value basis. The Government will award to the responsible Offeror(s) whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered.

*Id.* at 139.

The best-value analysis would involve an integrated assessment of the proposals based on price and six non-price factors, some of which included a number of subfactors:

Factor 1.0—Compliance
- Subfactor 1.1—Proof of American Ownership
- Subfactor 1.2—ATSA Wage Rate Compliance
- Subfactor 1.3—Subcontracting Plan

Factor 2.0—Management Approach
- Subfactor 2.1—Program Management
- Subfactor 2.2—Workforce Management
- Subfactor 2.3—Onboarding
- Subfactor 2.4—Quality Control
- Subfactor 2.5—Uniform Control
- Subfactor 2.6—Equipment and Consumables
- Subfactor 2.7—Facilities

Factor 3.0—Screening Services
- Subfactor 3.1—Passenger and Baggage Screening
- Subfactor 3.2—Layered Security Activities

---

**2.** The original RFP stated that "[c]ontractors shall complete all transition activities no later than 90 days after contract award." AR at 40. The amended RFP stated that "[c]ontractors shall complete all pre-transition and transition activities no later than 90 days after contract award." *Id.* at 306.

- Subfactor 3.3—Claims and Passenger Property

Factor 4.0—Security Training

Factor 5.0—Pre–Transition and Transition

Factor 6.0—Past Performance

Factor 7.0—Price

*Id.* at 139–40 (primary bullets omitted).

The RFP identified Factor 1 as the most important evaluative criterion and stated that proposals would be evaluated on a pass-fail basis for that factor, while Factors 2 through 6 would be evaluated and provided with adjectival ratings. *Id.* at 140. Because Factor 1 was to be evaluated on a pass-fail basis, the RFP indicated that the required tradeoff analysis would focus on Factors 2 through 7. *Id.* The RFP noted, moreover, that Factors 2 through 6 are arranged in descending order of importance:

- Factor 2.0 is more important than Factor 3.0.
- Factor 3.0 is more important than Factor 4.0.
- Factor 4.0 is more important than Factor 5.0.
- Factor 5.0 is more important than Factor 6.0.
- Factors 2.0, 3.0, 4.0, 5.0, and 6.0 when combined, are more important than Factor 7.0.

*Id.* The RFP also explained that "[a]s the technical merits of competing offers approach equal, price will become more important in any trade-off decision." *Id.* at 141. While the RFP indicated that all proposals would be assigned an adjectival rating for each of Factors 2 through 6, the RFP did not set forth the specific rating schemes to be applied to the proposals.

The RFP stated that in selecting the best-value proposal, the government might "award a contract to an Offeror that is other than the lowest priced offer, or to an Offeror that does not have the highest non-price factor rating." *Id.* at 139.

With respect to past performance, offerors were required to submit summaries for five contracts that were either ongoing or completed within the last three years for work that was either similar or relevant in terms of size, scope, complexity, or contract type. *Id.* at 133. However, the government also reserved the right to obtain information from sources other than the summaries submitted by offerors, *Id.* at 145, as well as the right not to contact all of the references submitted by offerors, *Id.* at 134. Finally, the RFP noted that offerors "who have no relevant Past Performance references will be evaluated as Neutral." *Id.* at 145.

In addition to the required technical and past-performance evaluations, each proposal would undergo a price analysis to determine whether the proposed price of a proposal was fair, reasonable, and balanced. *Id.* at 145. The RFP stated that each proposal would be evaluated based upon its total evaluated price, which is calculated by summing the extended price for each contract line item number (CLIN) for each contract period. *Id.*

The RFP contained a template to be used by offerors in proposing their total prices for each airport. The total pricing template for the base year included a transition period of no more than three months, the provision of screening services for at least nine months, and an award fee for screening services performed during the base year.[3] *See id.* at 241. The template for each option year included twelve months of screening services and two semiannual award fees. *See id.* at 241–43. Under the RFP, the successful offeror would provide no screening services during the transition period, at least not under that particular contract. *See* Tr. at 45 (counsel for defendant) ("I do want to clarify that the solicitation makes clear that security screening services would not be performed by an offeror[ ] during the transition services. They were two separate line items.").

---

**3.** The price template contained in the RFP denoted three months of transition activities and nine months of screening services in the base year. *See* AR at 241. TSA allowed offerors to reduce the length of the transition period, but they were not allowed to extend it to more than three months. *See id.* at 40 (stating that all transition activities must be completed within ninety days after contract award).

In addition to the general templates used to calculate total prices, the RFP also contained specific pricing templates for labor, fringe benefits, and other costs to generate the total prices presented in the general templates. *See* AR at 246–58. The RFP stated that a proposal would be excluded from the competition without discussion when its price was determined to be unfair, unreasonable, or materially unbalanced. *Id.* at 145.

### 2. The Source Selection Plan

On June 8, 2010, TSA issued its final Source Selection Plan (SSP) for the procurement.[4] *See* AR Tab 6. In the SSP, TSA established the source selection team and described the process for evaluating the proposals for the SPP contracts:

> The Source Selection team consists of the Technical Evaluation Team (TET), Past Performance Evaluation Team (PPET), and Price Evaluation Team (PET); the team will review and evaluate offers and provide a written report of their findings. The Source Selection Evaluation Board (SSEB) will perform a trade-off analysis as necessary and make an award recommendation to the Source Selection Authority (SSA). Other identified individuals will act as non-voting advisors. The SSA[ ] shall make an independent award decision based on a comparative assessment of proposals against all source selection criteria in the solicitation.

*Id.* at 456.

The SSP reaffirmed the RFP's statement that proposals would be evaluated on a best-value basis in accordance with price and six non-price factors. *Id.* at 437–38. The SSP also confirmed that Factor 1 would be evaluated on a pass-fail basis, that Factors 2 through 6 would be evaluated and assigned an adjectival rating, that the six non-price factors were listed in descending order of importance, and that Factors 2 through 6, when combined, were to be more important than price. *Id.*

The SSP established a four-level adjectival rating scheme, including corresponding narrative descriptions, for Factors 2 through 5. AR at 458. The possible ratings on those non-price factors were "Outstanding," "Good," "Acceptable," and "Unacceptable." *Id.* With respect to Factor 6, on the other hand, the SSP established only three possible ratings: "Acceptable," "Neutral," and "Unacceptable." *Id.* The SSP also defined the terms "Strength," "Weakness," "Deficiency," and "Risk." *Id.* at 458–59.

Under the SSP, the TET evaluates the technical merits of each proposal on Factors 1 through 5 and provides a "Consensus Technical Evaluation Report" to the SSEB. *Id.* at 459. The PPET performs an evaluation of the offerors' past performance and then summarizes its conclusions on Factor 6 in a "PPET Report" that is also provided to the SSEB. *Id.* Finally, the PET performs a price and cost analysis for each proposal in accordance with Factor 7, and its chair then submits a "Price Report" to the SSEB. *Id.* at 460.

Next, the SSEB reviews the reports submitted by the TET, PPET, and PET, and is required to perform a written best-value tradeoff analysis of the proposals.[5] AR at 456, 460. Based upon the results of that analysis, the SSEB then forwards a best-value recommendation to the SSA for consideration. *Id.* The SSP cautions the SSEB to "[e]valuate each proposal against the established evaluation criteria only and ensure that proposals are not compared against one another." *Id.* at 460.

Finally, the SSA is required to "make an independent award decision based on a comparative assessment of proposals against all source selection criteria in the solicitation." *Id.* at 456. The SSA "is responsible for ensuring that all aspects of the source selection are conducted properly ... [and] for making all key decisions and selecting the Offeror to be awarded the contract after considering the recommendation from the Source Selection Evaluation Board (SSEB)." *Id.* at 457.

---

4. The cover sheet of the SSP indicates that it revised an earlier source selection plan. *See* AR at 435.

5. Before they are presented to the SSA, the reports prepared by the TET, PPET, PET, and SSEB are reviewed by the contracting officer and the Office of Chief Counsel for consistency and adequacy of documentation. AR at 460.

### 3. Initial Proposals

TSA received five proposals for the SPP contract at MCI, AR at 1093, 1151, including proposals from both plaintiff and intervenor, *see* AR Tabs 7–8.[6] The proposals were reviewed by the TET, the PET, and the PPET as required under the SSP, but they were not forwarded to the SSEB for a tradeoff analysis because the chairs of the TET and PET were unable to recommend any of the initial proposals for award.

#### a. Technical Evaluation Team

In its initial review, the TET assigned the following ratings to the proposals submitted by FirstLine and Akal for Factors 1 through 5:

| Factor | FirstLine | Akal |
| --- | --- | --- |
| Factor 2 | [ ] | [ ] |
| Factor 3 | [ ] | [ ] |
| Factor 4 | [ ] | [ ] |
| Factor 5 | [ ] | [ ] |

AR at 1124.

In addition, the TET identified the following numbers of strengths and weaknesses in the initial proposals submitted by FirstLine and Akal:

| Factor | FirstLine | | Akal | |
| --- | --- | --- | --- | --- |
| | Strengths | Weaknesses | Strengths | Weaknesses |
| Factor 2 | [ ] | [ ] | [ ] | [ ] |
| Factor 3 | [ ] | [ ] | [ ] | [ ] |
| Factor 4 | [ ] | [ ] | [ ] | [ ] |
| Factor 5 | [ ] | [ ] | [ ] | [ ] |
| TOTAL | [ ] | [ ] | [ ] | [ ] |

AR at 1099–1116.

[ ] of the weaknesses in the Akal proposal, moreover, were described as "significant," and the TET report noted that those significant weaknesses would require either "substantial" or "extensive" governmental intervention to correct. *Id.* at 1111–12, 1115–16.

#### b. Price Evaluation Team

The total evaluated price of FirstLine's initial proposal was determined to be $[ ], while the total evaluated price of the initial proposal submitted by Akal was $[ ]. *Id.* at 1151. The PET concluded that the prices of both proposals were fair, reasonable, and balanced.[7] *See id.* at 1524.

#### c. Past Performance Evaluation Team

The PPET contacted some, but not all, of the past-performance references submitted by FirstLine and Akal and assigned both of those offerors a rating of "Acceptable" on Factor 6. AR at 1126. The conclusions of the PPET, which are attached to the original TET consensus report, note that both offerors "have a history of delivering high quality services in the areas described in the RFP in an environment of same or similar size, scope and/or complexity." *Id.* at 1126–27. The PPET succinctly described FirstLine's past performance as "outstanding[,]" while noting that Akal's past performance has been "above expectation." *Id.* No explanation was given by the PPET regarding its cryptic remark about Akal, nor any indication as to whether its expectations had been high or low.

### 4. The Competitive Range and Discussions

Based upon their initial review of the proposals for the MCI contract, the chairs of the

---

6. The FirstLine proposal was for MCI only, while Akal submitted proposals for both MCI and San Francisco International Airport. *See* AR Tabs 7–8.

7. The administrative record demonstrates that TSA made contradictory statements regarding whether the price of the initial FirstLine proposal was fair, reasonable, and balanced. In its final Price Cost Report, the PET stated that the price of the original FirstLine proposal ($[ ]) was fair, reasonable, and balanced. AR at 1524. In a discussion letter to FirstLine, however, TSA stated that FirstLine's initial proposal "price is evaluated to be [ ]." *Id.* at 1154.

TET and the PET were unable to recommend any of the proposals for award on a best-value basis. Two of the proposals were rejected outright for their failure to meet Factor 1, while a third proposal received ratings of "Unacceptable" on Factors 2 and 3. AR at 1151–52. The contracting officer determined that FirstLine and Akal had submitted the most highly rated proposals, but noted that the TET and PET chairs were unable to recommend award of the contract to either of those offerors. *Id.*

The TET and PET chairs concluded that the technical merits of the FirstLine proposal did not justify its high price and stated that they could not recommend the Akal proposal because it was characterized by significant weaknesses that could not be remedied without further discussions with the offerors. *Id.* at 1151. For those reasons, the contracting officer established a competitive range for the MCI contract pursuant to Federal Acquisition Regulation (FAR) 15.306(c), 48 C.F.R. § 15.306(c) (2010).[8] *See id.* Tab 15. FirstLine and Akal were the only offerors included in the competitive range. *Id.* at 1151–52.

On October 29, 2010, the contracting officer sent discussion letters to plaintiff and intervenor, in which the offerors were provided with topics to be addressed during separate meetings with the government on November 2, 2010. *See id.* Tabs 16–17. In her discussion letter to plaintiff, the contracting officer noted that FirstLine's proposed [ ].[9] *Id.* at 1154. In her letter to intervenor, the contracting officer noted a[ ]. *Id.* at 1156–57.

On November 8, 2010, plaintiff and intervenor both submitted written responses to TSA addressing the issues discussed during the November 2, 2010 meetings and in subsequent follow-up letters from TSA dated November 3, 2010.[10] *See id.* Tabs 18–19. In response to TSA's question regarding [ ], FirstLine stated that it would [ ]. *Id.* at 1235.

### 5. Final Proposal Revisions

By letter dated November 24, 2010, TSA instructed plaintiff and intervenor to submit Final Proposal Revisions (FPRs) for the MCI contract no later than November 29, 2010.[11] *See* AR at 1541. Both parties filed their FPRs before that deadline. *See id.* Tabs 20–21.

The FirstLine FPR contained the same [ ] as its initial proposal. *Compare id.* at 837, 908, 941 ([ ]), *with id.* at 1235, 1237 ([ ]). In its initial proposal, however, FirstLine had submitted prices for [ ] of transition activities and [ ] of screening services. *See id.* at 863. In its FPR, in contrast, FirstLine noted that "[ ]." *Id.* at 1237. Instead, FirstLine proposed prices in its FPR for [ ] and included [ ] transition period. *Id.* at 1270–71.

The FPRs were re-evaluated by the TET and the PET, *see id.* Tabs 22–23, but the PPET did not conduct a new past-performance evaluation of the proposals. The SSEB then considered the reports prepared by the TET, PET, and PPET, and engaged in an analysis of the two competing proposals for the purpose of making an award recommendation to the SSA. *See id.* Tab 25.

#### a. Technical Evaluation Team

The TET issued its consensus technical evaluation report on the FPRs on April 1,

---

**8.** In this opinion, unless otherwise noted, all citations to the FAR are to the 2010 version of title 48 of the Code of Federal Regulations (C.F.R.).

**9.** FirstLine asserts that TSA directed it to eliminate its transition period or to eliminate the costs associated with those activities. Pl.'s Mot. at 7. That assertion is not substantiated in the administrative record. In support of that allegation, FirstLine points to an October 29, 2010 letter from TSA to plaintiff. *See* AR Tab 16. In that letter, however, TSA does not suggest that First-Line eliminate its transition period or the costs associated with that period. Rather, one of the questions posed by TSA in the letter inquires why

FirstLine included [ ]. *See id.* at 1154. As the parties appear to agree, no screening services were to be provided by the successful offeror during the transition period under the contract. *See* Tr. at 45 (counsel for defendant), 73 (counsel for plaintiff).

**10.** The November 3, 2010 letters are referenced in the responses filed with TSA by plaintiff and intervenor, but those letters were not included in the administrative record.

**11.** The FPRs submitted by plaintiff and intervenor reference the November 24, 2010 letters from TSA, but those letters were not included in the administrative record.

2011. *See* AR Tab 22. With respect to the FPR submitted by FirstLine, the TET identified thirty-three strengths and no weaknesses. With respect to the Akal FPR, the TET noted one strength and one weakness. Notwithstanding the elimination of nearly all of the weaknesses identified in the initial proposals submitted by the parties, there was no change in any of the adjectival ratings assigned to the proposals on any of the evaluative factors or subfactors. The First-Line FPR received ratings of [ ] on Factors 2 through 4, and a rating of [ ] on Factor 5. The Akal FPR, on the other hand, received ratings of [ ] on every factor.

### b. Price Evaluation Team

In revising their respective proposals, plaintiff and intervenor produced FPRs with evaluated prices that differed substantially from the original proposals. The FirstLine FPR had a total evaluated price of $[ ], representing a[ ] from the price of its initial proposal. AR at 1524, 1526. The Akal FPR, on the other hand, had a total evaluated price of $[ ], which was approximately $[ ] than its initial price proposal. *Id.*

The PET utilized three different methods of determining whether the prices proposed by plaintiff and intervenor were fair, reasonable, and balanced. First, the PET compared the loaded labor rates proposed by the offerors with the minimum loaded rates mandated under ATSA. *Id.* at 1525. Next, the PET compared the prices proposed by the offerors with each other. *Id.* at 1525–26. Finally, the PET compared the proposed prices to the Independent Government Cost Estimate (IGCE). *Id.* at 1526. Based on those three methods of analysis, the PET concluded that the prices of both proposals were fair, reasonable, and balanced. *Id.*

### c. Source Selection Evaluation Board

On February 24, 2011, the SSEB issued its recommendation to the SSA. *See* AR Tab 25. Before turning to the required tradeoff analysis, the SSEB summarized the adjectival ratings assigned to the competing proposals by the TET and the PPET. *Id.* at 1542–45. Next, the SSEB discussed the analysis performed by the PET, and noted that the prices of both proposals were deemed to be fair, reasonable, and balanced. *Id.* at 1545–47.

In conducting its analysis to determine the best value to the government, the SSEB first noted that both proposals received the same rating on Factor 1, which the RFP identified as the most important factor, and on Factor 6, the least important non-price factor under the RFP. *Id.* at 1548. For that reason, the SSEB focused its analysis on the proposals' technical ratings for Factors 2 through 5 and their prices. The SSEB concluded that the price of the Akal proposal was "substantially less" than the price of the proposal submitted by FirstLine. *Id.* at 1549. The SSEB further stated that both proposals were "fully sufficient in meeting the Government's requirements[,]" but noted that the FirstLine technical proposal was only "moderately better" than the competing proposal from Akal. *Id.* For those reasons, the SSEB concluded that the technical superiority of the First-Line proposal did not justify the payment of a premium of approximately $[ ]. *Id.*

While the SSEB selected the proposal with the lower price, it stated that "[i]n making this determination the SSEB did not make award on a lowest-cost technically acceptable basis, but rather concluded that the higher technical merit offered by FirstLine's proposal did not outweigh AKAL's price advantage." *Id.* at 1549.

### 6. Source Selection Authority Decision and Award to Akal

On March 17, 2011, the SSA accepted the recommendation of the SSEB and determined that the Akal proposal represented the best value to the government. The SSA's decision was embodied in a single paragraph on a form attached to the SSEB recommendation:

> After consideration of the information provided to me by the technical and price evaluation members and after accomplishing an independent review and assessment of the technical and price consensus reports, I hereby determine that AKAL Security is the best value offer solution by utilizing the trade-off method. Therefore, in accordance with the award determination criteria described in Sections L and M of the Request for Proposal, AKAL Securi-

ty shall be awarded the Firm Fixed–Price / Award Fee contract for the Security Screening Services for Kansas City International Airport (MCI) at the NTE amount of $[ ].

AR at 1539.

By letter dated April 22, 2011, TSA informed FirstLine that the SPP contract for MCI had been awarded to Akal. *See id.* Tab 29. In that letter, and in a subsequent debriefing on April 26, 2011, *see id.* Tab 30, TSA stated that the contract had been awarded to Akal due to the substantial discrepancy in price between the two proposals. FirstLine's total evaluated price was $[ ], while Akal's price was $[ ], representing a difference of approximately sixteen percent.

## II. Procedural History

### A. GAO Protest

FirstLine filed a protest with the United States Government Accountability Office (GAO) on May 2, 2011. Pursuant to the Competition in Contracting Act (CICA), 31 U.S.C. § 3553 (2006), the filing of that protest with GAO triggered an automatic stay of performance. TSA ordered Akal to cease performance of the contract on May 3, 2011. *See* AR Tab 32. In accordance with 4 C.F.R. § 21.11 (2011), FirstLine withdrew its GAO protest subsequent to commencing its suit in this court.

### B. Proceedings in this Court

FirstLine filed its original complaint in this matter on June 10, 2011. With its complaint, FirstLine also filed a motion for a temporary restraining order and preliminary injunction, along with a supporting memorandum.[12] Akal filed its motion to intervene in this protest as the successful offeror on June 13, 2011, and the court granted that motion the next day.

12. FirstLine also filed a motion for a protective order, which was denied as moot when the court granted the government's unopposed motion for a protective order.

13. In this opinion, FirstLine's memorandum in support of its motion for judgment on the administrative record will be cited as "Pl.'s Mot."; the

In accordance with the amended scheduling order, the government filed the administrative record on June 17, 2011. On June 24, 2011, FirstLine filed an amended complaint, as well as a motion for a permanent injunction, a motion for judgment on the administrative record, and a supporting memorandum.[13] In addition, FirstLine filed a motion to supplement the administrative record with two news stories concerning various security lapses at an airport not at issue in this matter. FirstLine included those documents as Exhibit A and Exhibit B to the memorandum in support of its motion for judgment on the administrative record.

On July 5, 2011, the government and intervenor filed their respective cross-motions for judgment on the administrative record and their responses to FirstLine's motion for judgment. In addition, defendant and intervenor each filed a response in opposition to FirstLine's motion to supplement the administrative record. The government also moved to strike the documents attached as Exhibit A and Exhibit B to FirstLine's memorandum in support of its motion for judgment on the administrative record.

FirstLine filed its response to defendant's and intervenor's cross-motions for judgment on the administrative record and its reply to their respective responses on July 11, 2011. The government and intervenor filed their respective replies to FirstLine's response on July 15, 2011, and the court heard oral argument from the parties on July 21, 2011. The government has agreed to stay performance of the contract in this matter until the court has resolved this protest on the merits.

## DISCUSSION

### I. Bid Protest Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed

government's cross-motion for judgment on the administrative record will be cited as "Def.'s Mot."; and intervenor's memorandum in support of its cross-motion for judgment on the administrative record will be cited as "Akal's Mot."

contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002).

## II. Standard of Review for Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## III. Bid Protest Review

■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing

before this court. *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001) (*Impresa*)). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)).

■ In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g., Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1376 (Fed.Cir.2009) (reversing this court when it "substitut[ed] ... the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Instead, the court must "determine whether the agency's ... analysis [of proposals] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* at 1375–76 (citation omitted). The court will

"sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citation omitted).

 " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts,* 216 F.3d at 1057).

## IV. Standing

 Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and standing before this court. *Rex Service,* 448 F.3d at 1307–08. Neither TSA nor Akal challenges FirstLine's standing to bring this protest. Here, FirstLine was the incumbent contractor and an actual bidder, *see* AR Tabs 8, 21, and one of only two offerors in the competitive range, *see id.* at 1152. FirstLine's proposal received superior adjectival ratings in all but one of the non-price evaluation criteria listed in the RFP, and it received the same adjectival rating as the successful offeror on the remaining non-price factor. *Id.* at 1548. FirstLine's proposal thus had a substantial chance of being selected for award if all of the procurement errors alleged by FirstLine were corrected. For this reason, FirstLine has standing to bring this bid protest.

## V. Supplementation of the Administrative Record

FirstLine has filed a motion to supplement the administrative record with two documents. The first is an Internet news story concerning security breaches at Phoenix Sky Harbor International Airport (PHX), and the second is a transcript of a television news story concerning the same issue. FirstLine notes that Akal performed non-SPP security services at PHX during the relevant time frame. FirstLine does not assert that these documents were before the agency when it made its award decision. Rather, FirstLine argues that TSA was aware, or should reasonably have been aware, of Akal's poor performance at PHX and that such knowledge should have been considered in TSA's assessment of the offerors' past performance.

 The Federal Circuit has adopted a restrictive standard for supplementation of the administrative record in bid protests before this court, noting that such "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.' " *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1380 (Fed.Cir.2009) (citation omitted). Because the absence of the proffered articles from the administrative record will not preclude effective judicial review in this case, FirstLine's motion to supplement the administrative record is denied. For the same reason, the government's motion to strike the exhibits to the memorandum in support of FirstLine's motion for judgment on the administrative record is granted.

Here, the court concludes that the documents proffered by FirstLine are not necessary to effective judicial review of TSA's procurement decision in this case. First, there is no evidence that TSA actually considered those documents in its evaluation of the proposals submitted by the parties. For that reason, the articles are not included among the "information upon which the agency relied when it made its decision [or]

documentation revealing the agency's decision-making process." *Mont. Fish, Wildlife, & Parks Found., Inc. v. United States,* 91 Fed.Cl. 434, 440–41 (2010) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Supplementing the administrative record with the proffered articles would contravene the requirement that the court limit its review to the " 'administrative record already in existence, not some new record made initially in the reviewing court.' " *Axiom,* 564 F.3d at 1379 (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)).

Nor was TSA under any affirmative obligation to consider information related to the referenced work performed by intervenor at PHX. The FAR states that the government is required to consider past-performance information submitted by an offeror, "as well as information obtained from any other sources, when evaluating the offeror past performance." 48 C.F.R. § 15.305(a)(2)(ii). FirstLine has submitted no evidence, however, demonstrating that the source selection team had obtained any information related to Akal's contract at PHX in connection with its review of the offerors' proposals.

FirstLine notes that under the RFP, the government "reserves the right to obtain and utilize information from sources other than those identified by the Offeror." AR at 145. While that language certainly allows TSA to base its decision on past-performance information other than what was submitted by the offerors, it by no means *requires* the government to consider such information, nor does it require the government to actively pursue adverse past-performance information not submitted by the offerors.[14] Indeed, counsel for plaintiff conceded that very point during oral argument. *See* Tr. at 81. Because the

documents proffered by plaintiff are not necessary to allow effective judicial review of the government's decision in this case, the court denies FirstLine's motion to supplement the administrative record and grants defendant's motion to strike Exhibits A and B to the memorandum in support of FirstLine's motion for judgment on the administrative record.

## VI. Alleged Flaws in the Procurement

FirstLine asserts that the protested award is flawed in a number of respects. The alleged errors fall into two broad categories: errors committed by the SSEB and the SSA, and errors committed before the competing proposals were forwarded to the SSEB.

FirstLine argues that the SSEB and the SSA committed three fatal errors in their review of the parties' proposals. First, plaintiff contends that the SSEB failed to conduct a proper best-value analysis and actually awarded the subject contract on a lowest-price, technically acceptable basis. Next, plaintiff argues that the SSA failed to perform an independent assessment and evaluation of the offerors' proposals and instead relied entirely on the flawed recommendation of the SSEB. Finally, FirstLine contends that the SSEB and the SSA both failed to consider the substantial additional costs of paying another firm to provide security screening services during the initial three-month transition period contemplated under the Akal proposal, during which time Akal would be unable to perform those services.

FirstLine further argues that the government committed several significant procurement errors before the proposals were reviewed by the SSEB or the SSA. For that reason, according to plaintiff, the protested contract award would have been invalid even if the SSEB and the SSA had properly performed their duties under the RFP. FirstLine alleges five errors in this category.

---

**14.** Intervenor notes that the documents proffered by FirstLine involve events that occurred in 2007 and further suggests that it was not required to submit information on that contract for the purpose of meeting the past-performance requirements of the RFP, which required offerors to "provide a contract summary for five (5) contracts either ongoing or completed within the

past three years that demonstrates performance similar or relevant to the solicitation performance requirements." AR at 133. However, it is not clear from the record whether the contract under which the allegedly poor performance occurred expired more than three years before the parties submitted their initial proposals or FPRs.

First, plaintiff asserts that the Independent Government Cost Estimate (IGCE) was flawed because it dramatically understated the costs of non-screener labor and wholly omitted the cost of general liability insurance. Second, FirstLine asserts that TSA evaluated the offerors' past performance on a pass-fail basis, which is contrary to the express requirements of the RFP. Third, FirstLine argues that TSA conducted a flawed past-performance evaluation that was both irrational and inconsistent with the requirements of the RFP. Fourth, FirstLine argues that the adjectival ratings assigned to its proposal by the TET were inconsistent with its discussion of the proposal and with the narrative descriptions of those ratings as set forth in the SSP. Finally, FirstLine asserts that TSA failed to consider the significant risk created by Akal's failure to include the required cost of general liability insurance in its proposal.

As discussed below, some of these assertions have merit, and some do not, but the significant procurement errors committed in this case require that TSA's award of the subject contract to Akal be set aside. For that reason, the court must grant FirstLine's motion for judgment on the administrative record, and it must deny the cross-motions for judgment filed by the government and Akal.

## A. Alleged Errors Committed by the SSEB and the SSA

FirstLine asserts that the SSEB was required to conduct a best-value tradeoff analysis under the RFP and failed to do so. In addition, FirstLine argues that the SSA adopted the SSEB report without performing an independent evaluation and assessment of the competing proposals. Finally, according to plaintiff, neither the SSEB nor the SSA considered the additional out-of-contract costs of screening services during the ninety-day transition period of a non-incumbent. The court will address each argument in turn.

### 1. The SSEB Failed to Conduct a Proper Best–Value Analysis

■ FirstLine asserts that the SSEB did not conduct a proper best-value tradeoff analysis as required by the RFP and the SSP. Instead, according to plaintiff, the SSEB simply selected the lowest-priced proposal that satisfied the minimum technical requirements of the RFP. The parties agree that TSA was required to conduct a best-value tradeoff analysis under the terms of the RFP. They disagree, however, with respect to whether the evaluation conducted by the SSEB satisfied that requirement. For the following reasons, the court concludes that it did not.

### a. The Requirements of the RFP, the SSP, and the FAR

The RFP stated that the government would evaluate the offerors' proposals on a best-value basis:

> The Government will make the award decision(s) on a Best Value basis. The Government will award to the responsible Offeror(s) whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered.

AR at 139. The RFP further provided that the best-value analysis would involve an integrated assessment of the proposals in accordance with the seven evaluative factors set forth therein. *Id.* at 139–40. Factor 1 was to be the most important evaluative factor. *Id.* at 140. Factors 2 through 6 were listed in descending order of importance and, when combined, were to be more important than price.[15] *Id.* Under the RFP, each proposal

---

15. Under the FAR, the government must state whether the non-price factors set forth in the solicitation are significantly more important than price, approximately equal in importance to price, or significantly less important than price. 48 C.F.R. §§ 15.101–1(b)(2), 15.304(e). In this case, the RFP states that Factors 2 through 6, when combined, are "more important" than price. AR at 140. Because Factor 1 is the most important evaluative criterion, *id.*, it might be

reasonable to interpret the RFP to indicate that non-price factors (*i.e.*, Factors 1 through 6) are "*significantly* more important" than price, as required under the FAR. The failure of the RFP to conform to FAR 15.101–1(b)(2) and FAR 15.304(e), however, may have permitted the SSEB to incorrectly apply the FAR requirements for a best-value analysis. *See id.* at 1542 (stating in the SSEB report that the "non-price factors,

would be assigned an adjectival rating for each of Factors 2 through 6 and their subfactors, but the specific rating scale or scales to be applied were not set forth in the RFP. Finally, the RFP noted that "[a]s the technical merits of competing offers approach equal, price will become more important in any trade-off decision." *Id.* at 141.

The SSP established a four-rating adjectival scale for Factors 2 through 5, but created a three-rating scale for the evaluation of past performance. *Id.* at 458. Under the SSP, technical ratings on Factors 2 through 5 were to be assigned to the proposals by the TET. The PPET would assign the proposals an adjectival rating for past performance, and the PET would calculate the total evaluated prices of the proposals and determine whether those prices were fair, reasonable, and balanced. Following that initial level of review, the SSEB would perform a tradeoff analysis of the proposals in order to recommend one of them to the SSA for contract award on a best-value basis.

The FAR notes that "[t]he objective of source selection is to select the proposal that represents the best value." 48 C.F.R. § 15.302. In determining which proposal represents the best value, the government must compare the relative costs and benefits of the competing proposals, including both price and non-price factors, in a best-value tradeoff analysis:

> This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

*Id.* § 15.101–1(c). The FAR sets forth specific requirements for a best-value tradeoff analysis, *see id.* § 15.101–1, and sets forth a different set of requirements for a lowest-price technically acceptable procurement, *see id.* § 15.101–2.

### b. The SSEB's Award Analysis

The SSEB report is a ten-page document issued on February 24, 2011. *See* AR Tab

when combined, are more important than Factor

25. The two-page background section of the document describes the SPP and the history of the procurement for the MCI contract. In that section, the SSEB notes that an initial tradeoff analysis was performed on October 6, 2010, before the contracting officer established the competitive range, but there is no documentation of that analysis in the administrative record. *Id.* at 1541.

The remainder of the document purports to be the best-value tradeoff analysis performed by the SSEB for the two proposals in the competitive range. The tradeoff analysis begins with a short summary of the evaluative scheme established by the RFP and the SSP and sets forth the ratings assigned to the proposals for Factors 1 through 6, as well as the total evaluated price of each of those proposals.

Next, the analysis presents the ratings assigned to the two proposals on each factor and subfactor in a tabular format, and then provides a narrative summary on each factor. The summary for Factor 1 states that "[b]oth AKAL and FirstLine are evaluated as [ ] under Factor 1 and are therefore equal." *Id.* at 1542.

The narrative discussions of the proposals for Factors 2 through 6 are more extensive than those for Factor 1. For each of Factors 2 through 6, the narrative discussions follow a common pattern. First, the report sets forth, in a single sentence, the rating assigned to each proposal for that particular factor. *See, e.g.,* AR at 1543 ("AKAL is evaluated as [ ] and FirstLine is evaluated as [ ] for Factor 2."). Next, the report discusses—in separate paragraphs—some characteristics of each proposal on that particular factor. These narrative evaluations are drawn from the technical consensus report prepared by the TET and do not compare the relative strengths and weaknesses of the two proposals. Finally, the report sets forth a summary paragraph for each factor, in which it purports to compare the two competing proposals. The summaries range from one to three sentences in length, and are set forth below in their entirety:

[Factor 2] [ ]

7—Price.").

[Factor 3] [ ]

. . . .

[Factor 4] [ ]

. . . .

[Factor 5] [ ]

. . . .

[Factor 6] [ ]

*Id.* at 1543–45.

For Factor 7, the SSEB report first discusses the three evaluation methods used to determine whether the prices of the proposals were fair, reasonable, and balanced. AR at 1545–46. Following that discussion, the report concludes that "[b]oth offerors have been evaluated and their prices were determined to be fair, reasonable and balanced in comparison with the three techniques used for analysis." *Id.* at 1547.

The SSEB report then moves from a factor-by-factor analysis of the proposals to its determination of the "best overall value" to the government. *See Id.* at 1547–1549. In this section, titled "Best Overall Value," the report first sets forth some of the principal elements of the evaluative scheme established by the RFP and the SSP.[16] *Id.* at 1547–48. Next, the report presents the ratings assigned to the proposals for each factor and subfactor in a single comprehensive table. *Id.* at 1548. Finally, the report concludes with the SSEB's rationale for recommending intervenor's proposal for award as the best value to the government. *Id.* at 1548–49.

The report first notes that the two proposals received the same ratings on Factor 1—which, the report notes, is "the most important factor"—and Factor 6. AR at 1548. The report then states that FirstLine's proposal was assigned a "technically higher" rating than the Akal proposal on Factors 2 through 5. *Id.* While the report concludes that the prices of both proposals were deemed to be fair, reasonable, and balanced, it further notes that intervenor's proposed price is "substantially less" than the price proposed by FirstLine. *Id.* at 1549.

With respect to Factors 1 through 6, the SSEB concluded that both proposals "are fully sufficient in meeting the Government's requirements." *Id.* While the report acknowledges that FirstLine had the "better proposal," it further asserts that its technical superiority was not so significant "as would have been the case if FirstLine's proposal had received evaluated ratings of [ ] in Factors 2 through 4. *Id.* The report "expect[s]" that the FirstLine proposal would require less government intervention than the competing proposal and would entail less operational risk. *Id.*

Next, the SSEB compared the respective prices of the two proposals. *Id.* The report notes that there was a difference of almost $[ ] between the two proposals (a difference of approximately sixteen percent), and further states that the total evaluated price of the FirstLine proposal was almost $[ ] more than the IGCE, which was based on historical cost data at MCI. *Id.* In light of that difference, the SSEB stated that its tradeoff decision "must address whether or not the benefits to the Government offered by First-Line's moderately better technical proposal justify paying a premium of $[ ] for screening services at MCI." *Id.* The SSEB answered that question in the negative, stating, without explanation, that "the potential technical benefits to the Government in FirstLine's proposal do not justify a price $[ ] higher than that of AKAL's proposal, which also offered an acceptable level of technical competence." *Id.* Finally, the SSEB report includes the following statement: "In making this determination the SSEB did not make award on a lowest-cost technically acceptable basis, but rather concluded that the higher technical merit offered by FirstLine's proposal did not outweigh AKAL's price advantage." *Id.* Based on its analysis, the SSEB recommended that the SSA award the MCI contract to Akal.

### c. The SSEB's Best–Value Analysis Was Both Irrational and Significantly Flawed

FirstLine argues that the SSEB's purported best-value tradeoff analysis was irrational

---

**16.** The SSEB report provides the narrative descriptions of the "Good" and "Acceptable" ratings as set forth in the SSP. It does not provide the definition of "Outstanding," even though [ ].

and contrary to the RFP because the SSEB minimized the many substantial differences between the technical merits of the two proposals, and thereby elevated the importance of price in the evaluation of those proposals. FirstLine also argues that the government cannot base its award decision on the unsupported and conclusory assertion that the higher price of the FirstLine proposal was not warranted by its technical superiority. The court concludes that the analysis contained in the SSEB report was flawed in both respects.

### (i) The SSEB's Best–Value Analysis Was Irrational and Contrary to the RFP

While the decisions of procurement officials are entitled to substantial deference from a reviewing court, such deference is not unlimited. Whenever a procurement decision is without a rational basis or is based upon a clear violation of law, that decision must be set aside. For the reasons discussed below, the court concludes that the best-value analysis performed by the SSEB was both irrational and inconsistent with the evaluation scheme set forth in the RFP.

There is no dispute that the RFP contemplated the award of the MCI contract on a best-value basis, "price and other factors considered." AR at 139. The RFP stated that Factors 2 through 6 were listed in descending order of importance, and further provided that those factors, when combined, were to be evaluated as more important than price. Id. at 140. However, the RFP also explained that "as the technical merits of competing offers approach equal, price will become more important in any trade-off decision." Id. at 141.

The FirstLine proposal was technically superior to the proposal submitted by intervenor, and the differences between those two proposals were far from insignificant. For Factors 2 through 5, the proposals were rated on a scale with four levels. The difference between the ratings assigned to the proposals was one level for Factors 2 through 4 ( [ ] ) and two levels for Factor 5 ( [ ] ), all in favor of FirstLine. Id. at 1548. Furthermore, the adjectival ratings assigned to the parties' proposals do not fully capture the differences between those proposals.

With respect to Factor 2, for example, the FirstLine proposal was assigned [ ] identified strengths. Id. at 1482–89. In contrast, the TET did not identify [ ] in intervenor's proposal on that factor. Id. at 1493–95. In all, the FirstLine proposal had thirty-three strengths and not a single weakness, Id. at 1482–92, while intervenor's proposal had just one strength and one weakness, Id. at 1493–96.

In its report, the SSEB minimized the substantial differences between the proposals, which had the effect of elevating the relative importance of price in its best-value tradeoff analysis. First, the SSEB downplayed the difference in the adjectival ratings assigned to the proposals. In addition, the SSEB largely ignored the chasm between the number of strengths assigned to the proposals, and instead focused its comparison almost exclusively on their respective ratings. These errors had the effect of converting the best-value procurement contemplated under the RFP into one based on low price and mere technical acceptability. Because the SSEB's best-value analysis was inconsistent with the RFP, it was irrational and contrary to law. See 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

In Femme Comp Inc. v. United States, 83 Fed.Cl. 704 (2008), this court set aside the award of three contracts, in part because the best-value tradeoff analysis performed by the SSA was arbitrary, capricious, and not in accordance with law. There, the court discerned a pattern or intent in the source selection award document to "inflate the technical portions of the low-price[d] offerors' proposals and downplay the technical superiority of the higher-priced offerors' proposals." Id. at 768. Further, the consequence of those errors was to elevate the importance of the price factor in contravention of the solicitation, which provided that the nonprice factors would be evaluated as significantly more important than price. In other words, the court held that the government "essentially convert[ed] the best value procurement into a technically acceptable, low-price pro-

curement." *Id.* at 758. The court concluded that the government's attempt to minimize the technical differences between proposals was arbitrary, capricious, and not in accordance with law. As will be discussed in greater detail below, the *Femme Comp* case and the instant case have much in common.

Here, it is clear that the SSEB failed to account for the significant differences between the competing proposals with respect to technical quality. First, the court cannot fathom how the SSEB could have reached the conclusion that the FirstLine proposal was only "moderately better" than the Akal proposal. *See* AR at 1549. In that regard, the court observes one essential and irrefutable fact—with respect to the four most important technical evaluation factors in the tradeoff analysis (Management Approach, Screening Services, Security Training, and Pre–Transition / Transition), FirstLine scored at least one full level above Akal in every factor. It is also even more difficult to comprehend the SSEB's conclusion in light of the fact that the FirstLine proposal was assigned thirty-three strengths and not a single weakness, while intervenor's proposal received only one strength and one weakness, particularly when [ ] of FirstLine's strengths were related to the most important non-price factor considered in the best-value tradeoff analysis. In the absence of any explanation of why the differences in the technical ratings assigned to the proposals were less significant than the ratings would indicate, or why the many strengths assigned to the FirstLine proposal were entitled to scant weight in the analysis, the SSEB's conclusion that the FirstLine proposal was only moderately better than the Akal proposal must be termed as arbitrary and capricious.

Next, the SSEB report states that the proposal submitted by intervenor is "fully sufficient in meeting the Government's requirements." *Id.* While that assessment may be accurate, it is also irrelevant because this was not a lowest-price technically acceptable procurement. In a best-value procurement, the relevant question is not whether the lowest-priced proposal will meet the minimum technical requirements set forth in the RFP; rather, the government must determine which proposal represents the best value to the government. *Compare* 48 C.F.R. § 15.101–1 (stating that a tradeoff analysis requires the government to balance the price of proposals against non-price factors in accordance with the solicitation), *with id.* § 15.101–2(b)(1) (stating that in a lowest-price technically acceptable source selection, the government must award the contract "on the basis of the lowest evaluated price of proposals meeting or exceeding the acceptability standards for non-cost factors"). Both this court, *see Femme Comp,* 83 Fed.Cl. at 757–70, and GAO have sustained bid protests for precisely this reason.

In *Preferred Systems Solutions, Inc.,* B–292322, B–292322.2, B–292322.3, 2003 CPD ¶ 166, 2003 WL 22242190, at *8 (Comp.Gen. Aug. 25, 2003), for example, GAO sustained a bid protest where the evidence indicated that the "agency may have improperly converted the source selection to one based upon technical acceptability and low price, instead of one emphasizing technical superiority and skills as announced in the RFP evaluation scheme." In that case, as in this case, the government selected a technically inferior proposal and justified that decision by stating that both offers were "acceptable" and noting a "significant difference in cost." *Id.*

Similarly, in *Johnson Controls World Services, Inc.,* B–289942, 2002 CPD ¶ 88, 2002 WL 1162912, at *5 (Comp.Gen. May 24, 2002), GAO sustained a protest for essentially the same reasons. There, as here, the government awarded a contract to a low-priced but technically inferior offeror. In support of the decision, the government argued that the winning proposal was "more than adequate," "exceeded the work management requirements," and "would get the job done." *Id.* at *6. GAO held that these statements were an insufficient basis for an award decision in a best-value procurement, and noted that the government had ignored important differences between the proposals. These cases demonstrate that the use of criteria such as whether a proposal is "acceptable" or "sufficient" has no place in a best-value tradeoff analysis.

Finally, the SSEB report concludes that the FirstLine proposal is not worth the pay-

ment of a price premium because the proposal submitted by intervenor "also offered an acceptable level of technical competence." AR at 1549. In addition to suffering from the problems discussed above, this statement is particularly misleading in that it suggests that both proposals were assigned an acceptable rating for each of the technical factors, which is not the case.[17] As noted above, FirstLine was assigned superior ratings on Factors 2 through 5. The only factor on which the FirstLine proposal was assigned a rating of [ ] was Factor 6, for which [ ]. Intervenor, in contrast, received across-the-board ratings of [ ].

In addition to minimizing the differences in the technical ratings assigned to the two proposals, the SSEB further compressed the differences between them by focusing almost exclusively on those ratings instead of comparing the strengths, weaknesses, benefits, and disadvantages of the proposals. As this court has noted, "the FAR requires more detail." *Femme Comp,* 83 Fed.Cl. at 768. When the government is required to perform a best-value tradeoff analysis, it cannot limit its comparison of the proposals to the ratings assigned to them by lower-level evaluators.

In *Femme Comp,* this court held that the comparison of proposals on the basis of technical ratings alone is insufficient in a best-value tradeoff analysis. There, the government noted in its source selection decision that two proposals had received the same adjectival rating, but "did not document any effort . . . to determine whether, despite the identical ratings, one was stronger than the other. . . ." 83 Fed.Cl. at 767. It appeared to this court that the government's "conclusions relied upon the Army's assigned ratings instead of the Army's underlying evaluations." *Id.* at 768.

Here, the SSP also required the SSEB to "[i]dentify and fully document proposal strengths, weaknesses, and clarifications as

well as provide an overall assessment of each proposal. . . ." AR at 460. The SSEB report does not document the strengths and weaknesses received by each of the competing proposals. Instead, the report contains a selective presentation of some of those strengths and weaknesses, but does not identify them as such.

In this case, the government not only ignored the dramatic difference in the number of strengths assigned to the proposals; it also took affirmative steps to minimize or neutralize those differences in the SSEB report. With respect to Factor 4, for example, the FirstLine proposal received [ ] strengths, while the Akal proposal received [ ]. The SSEB attempted to minimize that difference, noting that the parties "[ ]." *Id.* at 1544. This statement obscures the fact that the FirstLine proposal was not only assigned a higher adjectival rating on Factor 4, but was also assigned [ ] strengths for that factor, while intervenor's proposal was assigned [ ]. While the SSEB's careful use of parentheses might counter the charge that it misrepresented the number of strengths in the respective proposals, it reinforces the appearance of an intent to mask the real differences between them. *See Johnson Controls,* 2002 WL 1162912, at *7 (finding that the government attempted to minimize the differences between proposals by noting that both of them had major strengths, and thus "lump[ed] all of these major strengths together as if they were equivalent when they are not apparently so, and discard[ed] any underlying qualitative value they might represent with no supporting justification"); *cf. Femme Comp,* 83 Fed.Cl. at 769 (noting that the government in that case "emphasized the nature, quality, and extent of a proposal's strengths when it benefitted a lower-priced proposal but often ignored the nature, quality, and extent of a proposal's strengths and relied instead on the adjectival/color ratings

**17.** The SSEB report also notes that the proposals submitted by the parties were assigned the same rating on Factor 1, which the report emphasizes is *"the most important factor."* AR at 1548 (emphasis in original). While that statement is true, it is virtually meaningless in the context of a comparison between the proposals because that factor was evaluated on a strict pass-fail basis.

Because the proposals that failed to meet Factor 1 were eliminated from the competition on that basis, that factor cannot serve as a meaningful discriminator between competing proposals in any best-value tradeoff analysis. The statement is just one more example of the SSEB's attempt to create the appearance of technical equivalence between the two proposals.

when a higher-priced proposal was found to be superior").

The RFP stated that "[a]s the technical merits of competing offers approach equal, price will become more important in any trade-off decision." AR at 141. Despite the fact that here, the technical merits of the competing offers never approached equal, the SSEB conducted its best-value analysis in a manner that minimized the real differences between the proposals and created a false impression of equivalence, thus allowing the SSEB to base its decision largely on price instead of on the non-price factors. *Cf. Johnson Controls,* 2002 WL 1162912, at *10 ("Where, as here, the evaluation record evidences relative differences in proposal merit, general statements of equivalency are inadequate to show equivalency; the agency must compare the relative merits of the proposals in a manner that reasonably supports a determination of equivalency.").

In minimizing the importance of the non-price factors, and thus elevating the relative importance of price, the SSEB deviated from the requirements of the RFP, which required a best-value procurement. Instead, the government has essentially conducted this procurement on a lowest-price technically acceptable basis. For that reason, the SSEB's analysis and the subsequent award of the MCI contract to intervenor was arbitrary, capricious, and not in accordance with law. *See Femme Comp,* 83 Fed.Cl. at 770 (setting aside a contract award because the government converted a best-value procurement into a lowest-price technically acceptable procurement by minimizing or downplaying the technical differences between the proposals).

### (ii) The SSEB's Best–Value Analysis Was Insufficiently Documented

FirstLine argues that the SSEB's best-value analysis was insufficient in that it failed to explain why the technically superior proposal submitted by plaintiff was not worth a modest price premium. In response, the government asserts that the SSEB "performed a thorough and rational best value

determination, which was documented in an eight-page, single-spaced trade-off analysis within the SSA's signed Award Recommendation." [18] Def.'s Mot. at 13. The court agrees with plaintiff that the best-value recommendation contained in the SSEB report was not supported by an adequately documented tradeoff analysis as required under FAR 15.308.

While there are eight pages in the SSEB report that are labeled as a tradeoff analysis, it is clear that much of that space is occupied by nothing more than summaries of the evaluations conducted by the TET, the PPET, and the PET. In another bid protest challenging a best-value tradeoff decision, the court's "examination of the tradeoff exhibits ... reveal[ed] that, but for a few select passages, they simply reiterate descriptions of the procurement and adjectival ranking and discriminator information found in the technical evaluation portion of the source selection documents." *Serco, Inc. v. United States,* 81 Fed.Cl. 463, 499 (2008). The same can be said here.

FAR 15.308 sets forth the documentation requirements for a best-value tradeoff analysis:

> The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.

48 C.F.R. § 15.308. The language of that section applies to the decision of the SSA, but in this case the SSA documented her best-value tradeoff decision by adopting the report of the SSEB. For that reason, that report must meet the documentation requirements of FAR 15.308.

This court has held that in selecting a higher-priced, technically superior proposal for award, an agency must explain and document why the technical merits of that proposal warrant its higher price:

> ("[T]he court cannot, like an indolent schoolmaster grading a term paper, assess the reasonableness of a tradeoff analysis by the weight of the paper involved.").

---

**18.** The court notes that the reasonableness and sufficiency of a best-value tradeoff analysis cannot be determined by its length alone. *See Serco, Inc. v. United States,* 81 Fed.Cl. 463, 499 (2008)

[T]he agency is compelled by the FAR to document its reasons for choosing the higher-priced offer. Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. Indeed, apart from the regulations, generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions.

*Serco,* 81 Fed.Cl. at 497 (citations and footnote omitted). The same principle applies to the situation here, where the government has selected a lower-priced, technically inferior proposal, particularly when the RFP states that non-price factors are to be more important than price.

The vast majority of analysis in the SSEB report is nothing more than a selective summary of the ratings, strengths, and weaknesses assigned to the proposals by lower-level evaluators. In its factor-by-factor analysis of the proposals, moreover, the SSEB segregated the discussion of the offerors' proposals into separate paragraphs, as was conceded by the government during oral argument. *See* Tr. at 47. Those paragraphs do not compare the competing proposals in any meaningful way. The simple physical juxtaposition of otherwise unrelated discussions of the proposals does not address the relative benefits and disadvantages of those competing proposals, nor does it explain why a higher-priced, but technically superior, proposal does not merit its higher price. Likewise, the summary paragraphs for each factor—like the longer discussion paragraphs that precede them—fail to address the relative advantages and disadvantages of each proposal as compared with the other. Rather, the summary paragraphs typically include one or two sentences for each of the proposals, in which the SSEB summarizes the technical evaluation for those proposals.

To the extent that the SSEB attempted to perform a best-value tradeoff analysis at all, the only portion of its report that might be read to document that analysis is the final discussion on the last two pages of the report. As discussed below, however, that analysis contains nothing more than conclusory assertions based on flawed premises.

In its report, as noted above, the SSEB established a false equivalence between the proposals by minimizing the substantial differences between them. In an attempt to leverage on its faulty premise of minimal technical differences, the SSEB report then purports to determine whether the agency should pay a "substantially" higher price for a proposal that is only "moderately better" than the lower-priced proposal submitted by intervenor. AR at 1549. In response to that essentially rhetorical question, the SSEB concludes—without any discussion or analysis—that the technical benefits of the First-Line proposal do not warrant the payment of a $[ ] price premium.

Here, the government has not advanced a reasonable justification for its decision to select a technically inferior proposal due to its lower price. Indeed, it is debatable whether the SSEB's report provides any justification at all. Even if the SSEB had not downplayed the significant differences between the two proposals, it is clear that the conclusory statements contained in the SSEB report do not meet the documentation requirements for a best-value tradeoff analysis. The government cannot simply declare that a price premium is not justified by a superior technical proposal without some substantive discussion of why that is so.

In *Blue Rock Structures,* B–293134, 2004 CPD ¶ 63, 2004 WL 414581 (Comp.Gen. Feb. 6, 2004), for example, GAO held that an unsupported statement that a technically inferior proposal represented the best value to the government due to its low price failed to meet the requirement that the government document its rationale for the tradeoffs it makes. In sustaining the protest, GAO noted that "[a] tradeoff analysis that fails to furnish any explanation as to why a higher-rated proposal does not in fact offer technical advantages or why those technical advantages are not worth a price premium does not satisfy the requirement for a documented tradeoff rationale, particularly where, as here, price is secondary to technical considerations under the RFP's evaluation scheme." *Id.* at *3 (citation and footnote omitted).

Thus, when selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the government to simply state that a proposal's technical superiority is not worth the payment of a price premium. Instead, the government must explain specifically *why* it does not warrant a premium. *See Femme Comp*, 83 Fed.Cl. at 767–68 (holding that FAR 15.308 requires more than conclusory assertions to support the selection of a lower-priced, technically inferior offer); *Preferred Systems*, 2003 WL 22242190, at *5–*6 (sustaining a protest because, *inter alia*, "there was no analysis as to why the well-documented technical superiority of PSS's proposal with its attendant advantages was not worth the associated cost/price premium"); *Johnson Controls*, 2002 WL 1162912, at *5–*6 ("While the SSA states that he compared the various mission suitability strengths of each offeror and found 'no discernable benefits' in the other proposals that offset the 'significant advantage' of the lowest cost/price offered by the DynCorp proposal, such general statements fall far short of the requirement to justify cost/technical tradeoff decisions.").

FirstLine also argues that the SSEB was required to consider the costs that might result from the need for government intervention due to the higher level of risk associated with the proposal submitted by intervenor. To the extent that plaintiff is arguing that the government should have quantified such costs and balanced them against the higher price of FirstLine's proposal, that argument must fail for substantially the same reasons as FirstLine's argument, discussed *infra*, that the government was required to consider the out-of-contract costs of security screening services during the transition period of a non-incumbent contractor.

However, FirstLine is correct in its assertion that the SSEB was required to address whether Akal's lower price was still attractive despite the substantial operational risk associated with intervenor's proposal and the resulting need for additional government in-

tervention. *See Hi–Shear Tech. Corp.*, B–261206, 95–2 CPD ¶ 97, 1995 WL 517674, at *3 (Comp.Gen.1995) (noting that in a best-value procurement, the "[c]onsideration of risk is inherent in the evaluation of proposals"). The bare statement that the benefits of the FirstLine proposal do not justify the higher price of the proposal does not adequately address the issue. Because the performance risks associated with a particular proposal are typically captured in the ratings, strengths, weaknesses, and deficiencies assigned to that proposal, the performance of a proper best-value tradeoff analysis will generally ensure that such risks have been considered in the agency's decision-making process. Here, as discussed above, the SSEB failed to engage in a meaningful comparison of the relative strengths, weaknesses, benefits, and disadvantages of the proposals.

Finally, the court also notes that, with one insignificant exception, there is no evidence that the SSEB even considered the relative weight of the evaluation factors under the RFP.[19] The RFP stated that Factors 2 through 6 are listed in descending order of importance, and that those factors are together more important than price. The RFP also provided that "[t]rade-offs made in order to determine the best value awardee will be done based upon the evaluation results of Factors 2 through 7 *and the relative importance of Factors 2 through 7.*" AR at 140 (emphasis added). While the SSEB report reproduces the principal elements of the RFP's evaluation scheme for reference purposes, there is no evidence that the SSEB actually followed that scheme in performing its best-value analysis. Indeed, the government and intervenor appear to argue that there is no requirement that the SSEB consider the relative weight of the various evaluation factors in performing its best-value tradeoff analysis. *See* Def.'s Reply at 4 (asserting that the integrated assessment of proposals that was required under the RFP was satisfied when the SSEB based its evaluation on a "total comparison of technical factors and price"); Akal's Reply at 4 (asserting that the government was not required to

---

19. As noted above, the SSEB report states that FirstLine and Akal received the same ratings on Factor 1, "the most important factor," and on Factor 6, "the least important non-price factor...." AR at 1548.

weigh the evaluation factors in descending order of importance); Tr. at 91 (counsel for defendant) ("In almost every procurement there are technical factors that are differently weighted, but there's no attendant requirement that an agency follow a particular scheme in performing its tradeoff analysis."). In essence, the government and intervenor appear to assert that the SSEB and SSA were free to disregard the evaluation scheme of the RFP, as long as their evaluation of the proposals was reasonable.[20] That is not the law.

The government is required to set forth all evaluation factors and significant subfactors, and their relative weight, in the solicitation. *See* 48 C.F.R. § 15.304(d). The government must evaluate all proposals only in accordance with the factors and significant subfactors set forth in the RFP. *See id.* § 15.305(a). Having announced the relative weight of the non-price factors in the RFP, the government was not free to evaluate the proposals and award the MCI contract in accordance with another scheme, regardless of the reasonableness of that scheme. Because the SSEB did not document any analysis of the proposals in accordance with the relative weights assigned to each factor and subfactor, its report does not meet the requirements of FAR 15.305(a).

**2. The SSA Failed to Perform and Document an Independent Assessment and Evaluation of the Competing Proposals as Required under FAR 15.308**

■■■ While the SSEB plays an important role in the source selection process, it is the SSA that is ultimately responsible for selecting the proposal that represents the best value to the government. *See* 48 C.F.R. § 15.303(b)(6). In discharging that responsibility, the SSA is required to conduct a tradeoff analysis of the competing proposals and must base its contract award decision on that analysis. FAR 15.308 sets forth the

requirements for the SSA's best-value decision:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308. These requirements are mirrored in the SSP. *See* AR at 456 ("The SSA shall make an independent award decision based on a comparative assessment of proposals against all source selection criteria in the solicitation.") (punctuation omitted).

In essence, there are two principal requirements embodied in FAR 15.308. First, the SSA must reach an independent award decision based on a comparative assessment of the proposals against all of the criteria set forth in the solicitation. In reaching that decision, the SSA may use reports and other materials prepared by others. Second, the SSA must document its independent award decision. While that documentation must advance a rationale for business judgments or tradeoffs, the SSA is not required to quantify those tradeoffs.

On a short form attached to the SSEB recommendation, the SSA stated that "[a]fter consideration of the information provided to me by the technical and price evaluation members and after accomplishing an independent review and assessment of the technical and price consensus reports, I hereby

---

**20.** Under the RFP's evaluation scheme, it is not clear whether price is more or less important than any individual non-price factor. While price is less important than the combination of Factors 2 through 6, it may be more important than any individual non-price factor with the exception of Factor 1, which is designated as the most important factor in the RFP. For that reason, First-

Line's repeated characterization of price as the least important factor is not necessarily correct. *See* Tr. at 8, 14–15. Under the RFP, price may be more important than Factor 2, less important than Factor 6, or anywhere in between. This inherent ambiguity within the RFP's price evaluation scheme does not impact the court's analysis or the outcome in this case.

determine that AKAL Security is the best value offer solution by utilizing the trade-off method." AR at 1539. Based on that determination, the SSA awarded the MCI contract to intervenor in the amount of $[ ]. *Id.*

FirstLine asserts that the SSA did not perform the independent assessment of proposals required by the FAR. Instead, according to plaintiff, the SSA relied entirely on the recommendation of the SSEB. FirstLine argues that, in this case, the SSA wholly abdicated her legal duty to perform a best-value tradeoff analysis and to render an independent award decision based on that analysis. Because the required tradeoff analysis was not documented in the source selection decision statement, according to plaintiff, the SSA also failed to meet the documentation requirement of FAR 15.308.

Both the government and intervenor note that the source selection decision statement contains a signed representation that the SSA performed the required independent assessment and evaluation, and thus assert that her representation is entitled to a strong presumption of regularity and good faith. The court agrees. *See Am–Pro Prot. Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed.Cir.2002) ("The presumption that government officials act in good faith is nothing new to our jurisprudence."); *Impresa*, 238 F.3d at 1338 (noting that a "litigant challenging that presumption necessarily bears a heavy burden"). But that presumption does not grant the SSA a license to disregard FAR 15.308. As noted above, that provision does not merely require the SSA to perform an independent evaluation and assessment of competing proposals; it also requires her to document that evaluation and assessment. *See Serco*, 81 Fed.Cl. at 498 ("Of course, it is conceivable that the SSA, in his own mind, made such cost/benefit comparisons, but merely failed to capture them on paper. But, that too would violate the FAR and its documentation requirements."). Here, the SSA's documentation is limited to her adoption of the SSEB report and her otherwise unsupported statement that intervenor's proposal represents the best value to the government.

FAR 15.308 permits the SSA to "use reports and analyses prepared by others," but it also requires the SSA to document "the rationale for any business judgments and tradeoffs made or relied on by the SSA. . . ." 48 C.F.R. § 15.308. There is no question that the source selection decision statement in this case fails to document any business judgments or tradeoffs made or relied upon by the SSA. Indeed, the statement does not even mention—much less discuss—the First-Line proposal. Because a tradeoff analysis necessarily involves the comparison of more than one proposal, a document that mentions only the winning proposal cannot be viewed as documentation of the tradeoff analysis that resulted in its selection.

With respect to the source selection decision statement of the SSA, the court must answer a single question: does the SSA's adoption of the SSEB report meet the documentation requirement of FAR 15.308? Here, the court is constrained to conclude that it does not.

In *Information Sciences Corp. v. United States*, 73 Fed.Cl. 70 (2006), this court held that the SSA violated FAR 15.308 because he did not document his reasons for adjusting technical ratings that had been assigned to competing proposals by lower-level evaluators. Because the SSA in that case agreed with the recommendation of the SSEB minority report, and thus did not adopt the contrary recommendation of the majority report, the court held that some documentation for his rationale in choosing one over the other was necessary under FAR 15.308. *Id.* at 119–21. GAO has sustained protests on the same basis. *See DynCorp Int'l LLC*, B–289863, B–289863.2, 2002 CPD ¶ 83, 2002 WL 1003564, at *4 (Comp.Gen. May 13, 2002) ("Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the fundamental requirement that their independent judgments be reasonable, consistent with the stated evaluation scheme and adequately documented.") (citation omitted).

The SSA decision set aside in *Information Sciences* disagreed with the majority recommendation of the SSEB. Here, in contrast,

the SSA adopted the SSEB report in full. The government and intervenor both attempt to distinguish *Information Sciences* on that basis, arguing that the SSA is required to document its independent judgment and any business judgments or tradeoffs only when it disagrees with the recommendation of the SSEB or other lower-level evaluators. *See* Def.'s Reply at 5 (asserting that the SSA was not required ·to provide separate documentation of its decision because it concurred with the recommendation of the SSEB); Akal's Reply at 5 (asserting that the SSA is required to "separately articulate only those areas, if any, in which the SSA disagrees with · the recommendation of the SSEB"). There is no basis in FAR 15.308 for the distinction proposed by the government and intervenor, nor does such a distinction find solid footing in logic. FAR 15.308 does not state that "the SSA may use reports and analyses prepared by others," only when it agrees with the SSEB recommendation, nor does it require that the SSA document its independent decision only when it disagrees with the SSEB recommendation. Rather, the express language of the FAR requires the SSA to exercise independent judgment and document that judgment in every best-value procurement, regardless of whether it agrees with the recommendation of the SSEB.

In fact, the requirement that the SSA document its independent judgment is even more important when it agrees with the SSEB. When the SSA declines to adopt a recommendation from the SSEB, that disagreement suggests that the SSA has exercised independent judgment, rather than just rubber-stamping the decision of the SSEB. When the SSA agrees with the SSEB, on the other hand, there is an increased risk that the SSA has not exercised its independent judgment as required under FAR 15.308. Unless the SSA documents the basis of its agreement or disagreement with the SSEB, it is impossible to confirm that the decision was the product of the SSA's independent judgment.

The precise requirements for a source selection decision that complies with FAR 15.308 will depend on the circumstances of the case, and the reasonableness of the reports and other materials upon which the SSA relies in reaching its decision. In *Information Sciences*, this court described what might be viewed as the *sine qua non* of an adequate source selection decision under FAR 15.308:

> The SSA could have met the FAR requirement by stating: I agree with the Minority Report *because of reasons X, Y, Z.* Instead, the SSA wrote, "The SSA ... agrees with the minority reports, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable."

73 Fed.Cl. at 121 (emphasis in original). In short, the SSA must document the rationale for its decision. Here, the SSA should have explained why the FirstLine proposal was not worth its higher price, notwithstanding its substantial technical superiority.

The source selection decision statement here is nothing more than the unsupported adoption of the SSEB report, along with a conclusory assertion that intervenor's proposal represents the best value to the government. The court has held that the SSEB failed to perform a proper best-value tradeoff analysis. The court further holds that the SSA's adoption of the flawed SSEB recommendation does not show that the SSA conducted a comparative assessment of proposals, in this case a best-value determination, as required by the RFP. Furthermore, the documentation requirements of FAR 15.308 were not satisfied by the SSA in this procurement. In so holding, the court has essentially set forth the core of its ruling in this case, *i.e.*, that the source selection decision in this procurement, as manifested in the SSEB report and the SSA's award decision, was fatally flawed and cannot stand. The court will go on, however, to address the parties' remaining arguments for the sake of completeness.

3. **TSA Was Not Required to Consider the Additional Costs of Paying Another Firm to Provide Security Screening Services during the Initial Three-Month Transition Period Contemplated under the Akal Proposal**

FirstLine argues that "[t]he added performance costs for providing Security

Screening Services during Akal's three-month transition period should have been considered by TSA in its best value tradeoff decision." Am. Compl. ¶ 84. To the extent that plaintiff is challenging the price evaluation scheme set forth in the RFP, that argument is waived pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed.Cir.2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."). To the extent that plaintiff argues that TSA's tradeoff analysis could consider price factors not set forth in the RFP, neither the FAR nor relevant bid protest decisions support plaintiff's proposition.

### a. The RFP's Price Evaluation Scheme Was Clear but Irrational

Section M of the RFP clearly states that each offeror's price would be evaluated after the following calculation had been performed:

> Total Evaluated Price will be arrived at by summing the Extended Price for each CLIN [contract line item number] for each contract period.

AR at 145. The contract awardee, it is important to note, was not required to provide screening services during its proposed transition period in the base year, and that transition period could last as long as three months. *Id.* at 26, 306–07. There is absolutely no mention in the RFP of the out-of-contract costs that TSA would experience for screening services provided during the transition period proposed by an offeror. Thus, a non-incumbent offeror like Akal might propose a three-month transition period, which would result in out-of-contract costs for screening services for those three months, whereas an incumbent offeror like FirstLine might propose to provide screening services for the entire base year, triggering no out-of-contract transition period screening costs. In this respect, the price evaluation scheme

in the RFP ignored the out-of-contract costs of Akal's proposal, which plaintiff estimates to range from $[ ] to $[ ]. Pl.'s Mot. at 25; Pl.'s Reply at 15.

There is no doubt that offerors who propose longer transition periods (and force TSA to obtain or provide screening services during those transition periods) would reap a competitive price advantage by doing so. These offerors could offer TSA a lower-priced base year because transition services are much cheaper to provide than screening services.[21] Def.'s Reply at 6. Conversely, offerors who propose shorter transition periods (in FirstLine's case, twelve months of screening services in the base year) would be at a competitive price disadvantage. Indeed, one bidder posed this very question to TSA:

> [I]f a contractor can propose [transition completion] in less than 90 days, wouldn't that mean that they would be picking up the full cost of the screening workforce earlier than other competitors that proposed [transition completion] in 90 days ... and [that this contractor would be at] a competitive disadvantage ... ?

AR at 274 (punctuation omitted). As defendant's counsel conceded at oral argument, TSA provided no substantive answer to this bidder's question, Tr. at 40, and took no steps to rectify an obvious flaw in the price evaluation scheme.

The administrative record shows that the RFP sets forth a price evaluation scheme that clearly does not account for the out-of-contract costs of transition period screening services, which might vary greatly depending on the transition period proposed by an offeror. When the court asked whether this price evaluation scheme benefits the government, defendant's counsel stated that:

> It benefits the government to have vigorous competition. If the government were to build into its price evaluation scheme something that inherently favored incumbents or inherently favored non-incumbents, that would be a problem....

---

21. At oral argument, the court asked the parties to define transition services. Although no clear definition emerged from the parties' responses, during the transition period a contractor would prepare its personnel and management systems for the delivery of the security screening services required by the contract.

Tr. at 94. The court disagrees with defendant's conclusion that the price evaluation scheme in the RFP promotes competition.

A price evaluation scheme which does not reflect the true costs to the government of proposals does not promote vigorous competition—it frustrates the government's ability to accurately compare prices. The RFP's price evaluation scheme penalizes any offeror, including an incumbent, who could provide more months of screening services in the base year. This is an irrational price evaluation scheme which rewards offerors who offer fewer months of valuable screening services to the taxpayer. If TSA is willing to subsidize lengthy transition periods for non-incumbent offerors, the RFP's price evaluation scheme should take those subsidies into account so that the best-value proposal can be identified.

Both GAO and this court have recognized that transition costs, in some instances, may be considered when the procuring agency compares the costs to the government of incumbent contractor and non-incumbent contractor proposals. For example, GAO considered whether the "cost of changing contractors" could be applied to all non-incumbent bids on a computer time-sharing services contract in *Computer Time Corp.*, B–177750, 1973 CPD ¶ 57, 1973 WL 8642, at *1 (Comp.Gen. May 31, 1973). There, the agency's invitation for bids warned non-incumbent offerors that $1,000 would be added to their bids, for price evaluation purposes only, to account for costs related to computer program duplication and the transfer of data to a new contractor.[22] *Id.* at *1–*3. GAO concluded that

> adding the cost of program duplication and the time required to check out the time-sharing computer services program solicited to the bids submitted by new sources did not favor the current contractor, or prevent competition because of the high cost of the changeover as compared with bid prices, since the evaluation factor represents an accurate depiction of costs to the government to change contractors. . . .

*Id.* at *1. Thus, out-of-contract transition costs, where these costs are substantial, may properly be considered in comparing the prices of incumbent and non-incumbent proposals. *See, e.g., Cherokee Elecs. Corp.,* B–240659, 90–2 CPD ¶ 467, 1990 WL 293614, at *3 (Comp.Gen. Dec. 10, 1990) ("Transition costs may be an evaluation factor in appropriate circumstances . . . .") (citations omitted).

Indeed, in *Arch Chemicals, Inc. v. United States,* 64 Fed.Cl. 380, 403 (2005), this court enjoined a procurement which relied upon a price evaluation scheme that refused to consider the costs of changing to a new contractor. In *Arch Chemicals,* the incumbent contractor was entitled under the existing contract to be paid a lump sum of $8,513,000 by the United States if it shut down its chemical production facility. *Id.* at 399. The shut-down costs, under circumstances particular to that case, would necessarily have been triggered by the award of the new contract to any other contractor but the incumbent. *Id.* The solicitation announced that an offeror's price for the new contract would be evaluated only on the costs specified in the offeror's proposal, and that " '[n]o other costs will be included in the price evaluation.' " *Id.* (quoting solicitation). Thus, no out-of-contract costs could be considered by the agency, and the incumbent contractor challenged the solicitation in a pre-award bid protest.

This court in *Arch Chemicals* held that "the price evaluation methodology contained in [the solicitation] is arbitrary and irrational and, hence, unlawful, in that it excludes the $8,513,000 in plant shutdown-related costs for plaintiff's . . . [f]acility from the costs of offerors other than the plaintiff." 64 Fed.Cl. at 403. Although the government argued that it was seeking the most advantageous price for the chemical produced under the new contract, the court noted that "[i]f the best price is what one is looking for, then it is irrational to close one's eyes to these shutdown costs [under the existing contract]."

---

22. It should be noted that the price evaluation adjustment factor applied to non-incumbent bids in *Computer Time* was nearly fifty percent of the evaluated price of the contract. 1973 WL 8642, at *3. GAO suggested to the procuring agency that future solicitations be restructured to minimize the relative importance of transition costs in such competitions. *Id.* at *1.

*Id.* at 400. *Arch Chemicals* stands for the proposition that in certain circumstances, a price evaluation scheme that ignores out-of-contract transition costs is irrational and unlawful. Here, as in *Arch Chemicals,* the RFP's evaluation scheme ignored the true costs of the transition periods proposed by Akal and FirstLine, and was an irrational means of comparing the prices of these proposals.

### b. Challenges to the RFP's Price Evaluation Scheme Were Waived under *Blue & Gold Fleet*

Although plaintiff insists that FirstLine is not challenging the price evaluation scheme in the RFP, it is hard to read plaintiff's motion for judgment on the administrative record any other way. Plaintiff states that

> TSA's failure to consider the additional three months of security screening costs during Akal's transition period not only resulted in the agency conducting a flawed and inaccurate procurement analysis, but it effectively distorted the real price difference between Akal (whose price did not include any performance costs during its three-month transition) and FirstLine (whose price included those costs), and deprived the SSA of the information necessary to make a fully informed decision.

Pl.'s Mot. at 25. This "competitive disadvantage" flaw in the price evaluation scheme was apparent to at least one bidder, AR at 274, and FirstLine, as the incumbent contractor, must have been aware that its base year pricing, including twelve months of screening services, would not be competitive with the price of a non-incumbent's proposal including a lengthy transition period. Because First-Line did not protest the price evaluation scheme in the RFP before the submission deadline, it cannot now complain that the out-of-contract costs for Akal's transition period were not considered in the evaluation of Akal's price proposal. *See Blue & Gold Fleet,* 492 F.3d at 1313–15.

GAO decisions have consistently held that an offeror must challenge the treatment of transition costs in a solicitation's price evalu-

ation scheme before bids are due, if the challenge is to be considered timely. In *Computer Time,* for example, GAO noted that "protests based on alleged improprieties in any type of solicitation which are apparent prior to bid opening shall be filed prior to bid opening." 1973 WL 8642, at *2. In *Cherokee Electronics,* GAO noted that "since it was obvious that the RFP, requesting fixed-price proposals, did not contemplate the consideration of transition costs, Cherokee should have filed any protest that such costs must be considered prior to the closing date for receipt of proposals." 1990 WL 293614, at *3 (citations omitted).

■ This court has similarly held that, pursuant to *Blue & Gold Fleet,* challenges to a price evaluation scheme are waived if not lodged before bids are due to be submitted. *See, e.g., Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 713 (2010) ("[P]laintiff's challenges to the Army's price evaluation ... amount to allegations of a patent error and a patent ambiguity in the Solicitation [and are waived because plaintiff] failed to raise these objections with the Army prior to submitting its proposal...."); *Unisys Corp. v. United States,* 89 Fed.Cl. 126, 137 (2009) (holding that because the plaintiff had failed to challenge an alleged error in the solicitation's price evaluation scheme before the deadline for receipt of proposals, "Unisys has waived its right to protest the price evaluation methods contained in the RFQ"). To the extent that plaintiff in this case now argues that the price evaluation scheme in the RFP was irrational, that challenge has been waived.[23] The court now turns to plaintiff's misguided reliance on FAR 15.304(b) and *L–3 Commc'ns Titan Corp.,* B–299317, B–299317.2, B–299317.3, 2007 CPD ¶ 66, 2007 WL 1191559 (Comp.Gen. Mar. 29, 2007) (*Titan* ).

### c. TSA's Best–Value Analysis Was Required to Conform to the RFP

■ Plaintiff attempts to persuade the court that the transition-related screening

---

**23.** The court returns to the topic of the irrational nature of the RFP's price evaluation scheme later in this opinion, when discussing remedial meas-

ures that would be required in a new procurement for security screening services at MCI.

services costs which are clearly and irrationally excluded from the price evaluation scheme in the RFP could nonetheless be considered by TSA in its best-value determination. Plaintiff's argument fails because the RFP sets forth the evaluation factors to be considered in the best-value analysis, and TSA was required to perform its best-value analysis using these evaluation factors. The evaluation factors include the price factor, which, as discussed above, does not include out-of-contract costs, and several non-price factors, none of which addresses the costs of screening services that must be provided during the transition period proposed by a non-incumbent offeror.

In sum, the best-value analysis described in the RFP consists of "an integrated assessment of the Offeror's proposal for [the listed evaluation factors]." AR at 139. The RFP instructed offerors that TSA "will award to the responsible Offeror(s) whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered." *Id.* Simply put, the RFP lists the factors to be considered in TSA's best-value analysis, and the out-of-contract costs of Akal's proposed three-month transition period are nowhere to be found in that list.

The court agrees with defendant that TSA was required to follow the evaluation scheme presented in the RFP, and that to do otherwise TSA "would have impermissibly deviated from the solicitation's evaluation criteria." Def.'s Reply at 8. As GAO stated in *Cherokee Electronics,*

> Transition costs may be an evaluation factor in appropriate circumstances, but an agency may only evaluate them if offerors were advised such costs were to be evaluated. The Navy properly did not evaluate transition costs here since the RFP did not provide for the evaluation of such costs.

1990 WL 293614, at *3 (citations and footnote omitted). It is a fundamental principle of procurement law than an agency must conduct its best-value analysis using the evaluation factors and subfactors specified in the solicitation. *See, e.g.,* 48 C.F.R. § 15.101–1(b)(1) ("All evaluation factors and significant subfactors that will affect contract award and

their relative importance shall be clearly stated in the solicitation...."); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *Acra, Inc. v. United States,* 44 Fed.Cl. 288, 293 (1999) (stating that "the government is not permitted to rely upon undisclosed evaluation criteria when evaluating proposals"). For this reason, TSA could not consider the out-of-contract costs of Akal's proposed three-month transition period in its best-value analysis of proposals.

Plaintiff relies on two authorities for its argument that TSA's failure to consider these out-of-contract costs was "contrary to law." Pl.'s Reply at 18. The first is FAR 15.304(b). This regulatory provision states that "[e]valuation factors and significant subfactors must ... [r]epresent the key areas of importance and emphasis to be considered in the source selection decision[ ] and ... [s]upport meaningful comparison and discrimination between and among competing proposals." *Id.* The court has found no bid protest decision by this court that has applied FAR 15.304(b) in the post-award bid protest context, and no authority that would permit an agency to stray from the evaluation factors listed in a solicitation in order to make a more "meaningful comparison" of proposals. Instead, this provision is more properly raised in the pre-award context, where a protestor believes that the evaluation scheme presented in a solicitation will not lead to a meaningful comparison of proposals. *See Glenn Def. Marine (Asia) PTE Ltd. v. United States,* 97 Fed.Cl. 568, 577 (2011) (discussing FAR 15.304(b)(2) and its requirements when considering a pre-award challenge to a solicitation's price evaluation method). Thus, FAR 15.304(b) does not permit TSA to rely upon undisclosed evaluation criteria in its best-value analysis, and certainly does not require TSA to consider the out-of-contract costs of Akal's proposed three-month transition period in its best-value analysis.

Plaintiff also relies on a GAO decision, *Titan,* for its "holding" that an agency "could not simply evaluate the total evaluated prices [of an incumbent and a non-incumbent offer-

or] without considering the performance differences that those prices would buy." Pl.'s Reply at 17. Plaintiff misinterprets the holding in *Titan*. The *Titan* protest was sustained because GAO found evaluation errors in two of three management subfactors: fill rate (hiring plan) and experience. 2007 WL 1191559, at *5–*7. While GAO also considered a third alleged flaw in the evaluation of management subfactors, that of failing to appropriately account for the cost savings to the United States inherent in the lower transition costs of the incumbent's proposal, GAO noted that such an argument might have been waived as untimely. *Id.* at *10 n. 18.

Because the protest was sustained on the first two grounds, GAO declined to "resolve the timeliness issue." *Id.* Although GAO commented that the "evaluation scheme [in that procurement] fails to comply with the FAR requirement that it support meaningful comparison and discrimination between the competing proposals," citing FAR 15.304(b), that criticism did not provide the basis for invalidating the contract award in *Titan*, and, as such, cannot be considered to be the holding of *Titan*. *Id.* at *9. A careful reading of *Titan* shows that GAO considered the evaluation scheme in that solicitation to be neither "rational [n]or reasonable," but this analysis by GAO should not be read to suggest that agencies must consider undisclosed evaluation factors in making award decisions.

This court concludes that *Titan* offers no support for plaintiff's contention that TSA's failure to consider the out-of-contract costs of intervenor's proposed three-month transition period in its best-value analysis was contrary to law. For all of the above reasons, the court rejects FirstLine's contention that TSA was required to consider the cost of screening services during Akal's proposed transition period when evaluating the proposals in this procurement and when making its award decision.

## B. Other Alleged Errors in the Procurement

In addition to the alleged errors on the part of the SSEB and the SSA, FirstLine alleges that TSA committed a number of additional errors before the proposals were evaluated by the SSEB or the SSA. For that reason, FirstLine argues that, even if the SSEB and the SSA had properly performed their roles, the award decision must still be set aside because it was predicated upon flawed technical and price evaluations. *See* Pl.'s Mot. at 39.

FirstLine contends that the government committed five distinct errors in the procurement before the competing proposals were reviewed by the SSEB and the SSA. First, plaintiff argues that the IGCE was inaccurate because it understated the costs of general liability insurance (GLI) premiums and non-screener employees. Second, FirstLine asserts that TSA's past-performance evaluations were conducted on a pass-fail basis and were therefore inconsistent with the RFP, which required the government to assign adjectival ratings to proposals on that factor. Third, plaintiff argues that the past-performance evaluations of the parties' proposals were arbitrary and capricious. Fourth, FirstLine contends that the TET assigned adjectival ratings to its proposal that were inconsistent with the narrative evaluations of the proposal and with the descriptions of the adjectival ratings set forth in the SSP. Finally, FirstLine argues that intervenor's failure to include the cost of GLI in its proposal demonstrated a fundamental misunderstanding of the requirements of the RFP, and that TSA should have considered that omission in its evaluation of intervenor's proposal. For the reasons discussed below, the court holds that all of these additional arguments are without merit.

## 1. FirstLine Has Not Demonstrated that TSA's Independent Government Cost Estimate Was Flawed

■ FirstLine argues that TSA's Independent Government Cost Estimate was flawed because it failed to include costs for a number of items allegedly required under the RFP. Am. Compl. ¶¶ 99–101. For example, while the IGCE included a line item for general liability insurance, that line was left blank. Pl.'s Mot. at 13 (citing AR at 15). In its FPR, FirstLine budgeted $[ ] for general liability insurance in the base year and each of the four option years, resulting in total insurance costs of $[ ]. *Id.* at 9, 30. Plaintiff

asserts that the IGCE should have included an amount for general liability insurance similar to the one in FirstLine's proposal.

Defendant concedes that no amount for general liability insurance was included in the IGCE on the line devoted to that item. Def.'s Mot. at 22. Defendant notes, however, that the PET stated that the IGCE included general liability insurance in another category of costs, "Other Direct Costs." *Id.;* AR at 1524. Defendant's explanation that the IGCE included general liability insurance costs is reasonable and supported by the record. *See* AR at 1524; Def.'s Reply at 9 n. 4. Plaintiff has not convinced the court that the IGCE was flawed because it failed to include any amount for general liability insurance.

In addition, FirstLine proposed [ ] labor hours per year for non-screener employees at MCI, which was, according to plaintiff, lower than the number of such hours historically incurred by FirstLine under its current contract. Pl.'s Mot. at 29. The proposed annual cost for FirstLine's non-screener labor hours was $[ ], resulting in a total cost of $[ ] for non-screener labor hours over the entire life of the contract. *Id.* at 30. The IGCE, however, according to plaintiff, included pricing for only [ ] non-screener labor hours per year, which is almost seven times lower than FirstLine's proposal of [ ] non-screener hours per year. *Id.* According to plaintiff, the IGCE's estimate for non-screener labor over the life of the contract is $[ ] too low.

The parties vigorously debate whether the IGCE non-screener labor hours estimate was too low, and if it was too low, whether this estimate was so low that this error was prejudicial to FirstLine. The court notes that the alleged error in the IGCE related to non-screener labor hours, in the amount of $[ ], would be enough to be prejudicial in this instance. If the IGCE were indeed $[ ] too low, FirstLine's price was almost exactly equal to the IGCE, once corrected. The PET and the SSEB relied upon a comparison of FirstLine's and Akal's proposals with the IGCE, along with two other measures, to determine whether or not the offeror's prices were "fair, reasonable and balanced." AR at 1547. If the IGCE were significantly flawed, as alleged, TSA's price evaluation might be more susceptible to a determination that it was significantly flawed. *See OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed. Cir.2000) (holding that flawed calculations used in a price evaluation may render an award decision irrational and may be grounds for sustaining a bid protest). This is especially true, in this case, where the court has found that an unwarranted and overly simplistic valuation of price over technical superiority occurred.

Plaintiff, however, has not shown that the non-screener labor hours estimate in the IGCE caused the IGCE to be $[ ] too low, or too low in any significant amount. The court acknowledges Akal's skilled and detailed explanation of why the number of non-screener labor hours in the IGCE and FirstLine's non-screener labor hours could differ so greatly. *See* Akal's Reply at 14–17. The primary thrust of Akal's argument is that certain job functions in the IGCE are placed in the screener category of labor hours, whereas these same functions are in the non-screener category of labor hours in First-Line's proposal. *Id.* Akal's explanation of the disparity in non-screener labor hours was not rebutted by plaintiff's counsel at oral argument. *See* Tr. at 82 (asserting only that the IGCE was derived from historical data from MCI and that historical non-screener hours were seven times greater in number than the non-screener hours in the IGCE).

The court has reviewed the IGCE and FirstLine's FPR, and notes that there are significant differences in the "headcounts" of screener and non-screener positions. The IGCE estimated a need for [ ] screeners, which included [ ] full-time screeners and [ ] part-time screeners, and [ ] full-time non-screeners. AR at 14. FirstLine's initial draft staffing plan, which was unchanged in its FPR, proposed a headcount of [ ] full-time-equivalent "screeners" (which could include any number of full- and part-time screeners adding up to the equivalent of [ ] full-time screeners), and [ ] full-time-equivalent "non-screeners" (which could include any number of full- and part-time non-screeners

adding up to the equivalent of [ ] full-time non-screeners). *Id.* at 956–57.

It is not clear from these staffing descriptions whether some of FirstLine's non-screener labor hours are accounted for in the IGCE's screener labor hours estimate. What is apparent, however, is that First-Line's proposed staffing plan includes [ ] different job titles among its non-screener staff positions, and the IGCE includes only a handful.[24] It is clear to the court that a significant difference between the IGCE and FirstLine's FPR is that more administrative functions are included in FirstLine's non-screener labor hours estimate. *See* AR at 957 (including in the job titles of several non-screener positions terms such as [ ] ).

Akal has argued that FirstLine's non-screener labor hours estimate includes administrative functions that could have been accounted for in other ways, such as in overhead costs. Akal's Reply at 16. This argument, too, was not addressed by plaintiff's counsel at oral argument. Based on the parties' arguments and the record before it, the court finds that the IGCE counted labor hours in a way that is significantly different than FirstLine's approach in its FPR. For this reason, the court cannot conclude that the disparity in non-screener hours in the IGCE and the non-screener hours in First-Line's FPR necessarily indicates that the IGCE contained a significant error in this regard.

Plaintiff has not persuaded the court that the IGCE was $[ ] too low, or that it was significantly flawed. FirstLine has not, therefore, carried its burden to show that a significant error in the IGCE marred the SSEB's price evaluation or its best-value determination. *See Grumman Data*, 88 F.3d at 1000 (noting that the bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question (citing *CACI*, 854 F.2d at 466)). Plaintiff's bid protest cannot be sustained on this ground.

### 2. TSA's Evaluation Scheme for Past Performance Was Not Inconsistent with the RFP, nor Was It Irrational

The RFP states that proposals would be evaluated and assigned an adjectival rating for Factors 2 through 6. AR at 140. The government did not rate the past performance of the offerors on the same four-level scale used for the other factors. Instead, the offerors were assigned one of three potential ratings for Factor 6: "Acceptable," "Neutral," or "Unacceptable." *Id.* at 458. FirstLine asserts that this rating scale was inconsistent with the express requirements of the RFP and also lacked a rational basis. For the reasons discussed below, the court holds that the three-level rating scale used to evaluate the offerors' past performance was neither irrational nor inconsistent with the RFP.

#### a. The Rating Scale for Past Performance Was Consistent with the Requirements of the RFP

First, plaintiff contends that the government transformed the qualitative evaluation contemplated by the RFP into a pass-fail test for Factor 6. Pl.'s Mot. at 32–35. FirstLine asserts that the rating scale set forth in the SSP, in effect, contains only two possible ratings because offerors with no relevant past performance must be assigned a "Neutral" rating under FAR 15.305(a)(2)(iv). *See* Pl.'s Reply at 22 n. 12. The RFP and SSP both incorporate that requirement. *See* AR at 145 ("Offerors who have no relevant Past Performance references will be evaluated as Neutral"), 454 (same).

In *ManTech Telecommunications & Information Systems Corp. v. United States*, 49 Fed.Cl. 57, 67–70 (2001), *aff'd*, 30 Fed.Appx. 995 (Fed.Cir.2002), this court held that an agency cannot impose mandatory-minimum requirements when a qualitative assessment is required under the solicitation. The court explained that such requirements, which "are essentially pass/fail in nature[,]" must be set forth in the solicitation because they generally lead to the outright rejection of those

---

**24.** Of the [ ] full-time non-screeners in the IGCE's staffing plan, [ ] are specifically identified

([ ]) and [ ] are simply identified as "Operations Staff"). AR at 14–15.

proposals that do not meet its express requirements. *Id.* at 67.

Similarly, in *Preferred Systems,* 2003 WL 22242190, at *10, GAO held that an agency may not state in the solicitation that proposals will be subject to a qualitative evaluation with respect to a particular factor, and later subject the proposals to a pass-fail test for that same factor. Because the agency in that case had substituted a pass-fail test for a qualitative evaluation required under the solicitation, GAO sustained the protest on that basis. *Id.*

Here, in contrast, there is no indication in the SSP that a low rating on Factor 6 would result in the elimination of an offeror from the competition. Unlike Factor 1, which the RFP and the SSP both identify as a pass-fail factor, Factor 6 must be considered as part of the integrated best-value tradeoff analysis conducted by the SSEB. Because past performance is identified in the RFP as the least important non-price factor, an offeror who receives a poor rating on that factor would not face the same "serious consequences," *ManTech,* 49 Fed.Cl. at 67, as an offeror who fails to meet a pass-fail requirement.

The three-level rating scheme used for Factor 6 is not a pass-fail test for the additional reason that it is a *three-level* rating scheme. Despite FirstLine's assertion to the contrary, the "Neutral" rating in this scheme is not used only for offerors without any relevant past performance. While offerors without any relevant experience must be assigned a rating of "Neutral" under the RFP, *see* AR at 145, and under the FAR, *see* 48 C.F.R. § 15.305(a)(2)(iv), that rating is also assigned to offerors who have relevant past-performance experience that is not extensive.[25] Because pass-fail requirements are by definition binary in nature, a three-level

rating scale cannot constitute a pass-fail requirement.

FirstLine also argues that, even if the rating scale used for past performance can be viewed as an adjectival rating scale, the scale is still inconsistent with the RFP because it is not the same scale used for other non-price factors. Pl.'s Mot. at 32–35; Pl.'s Reply at 22–24. Unless the RFP expressly authorizes the government to use different scales for different factors, plaintiff contends, all of those factors must be evaluated in accordance with the same scale. FirstLine has identified no legal authority for this novel proposition, and the court is aware of none. Nothing in the RFP requires the government to use the same rating scale for all of the non-price factors. Rather, the RFP states only that "Factors 2.0–6.0, and all subfactors, will be evaluated and provided an adjectival rating." AR at 140. The use of a different scale for the evaluation of the offerors' past performance was not inconsistent with that language.

FirstLine also asserts that the use of a truncated rating scale for Factor 6 compresses the differences between the offerors and thus neutralizes the superiority of the FirstLine proposal. *See* Pl.'s Reply at 22–23. FirstLine argues that the government cannot use different rating scales for each factor because "[s]uch discrepancies in rating schemes would have the effect of artificially inflating and deflating certain factors, in contravention of the RFP's prioritization of the factors." *Id.* at 22. In some cases, the use of a compressed rating scale for one factor but not others might distort the comparison of competing proposals. Here, the use of a three-level rating scale for past performance does not raise the same concerns.[26]

---

25. It appears to the court that the categories of the adjectival ratings used for Factor 6 may not be mutually exclusive. For example, an offeror with a non-extensive history of delivering high-quality services in an environment of similar size, scope, and complexity would fall within the definition for two different ratings (Acceptable and Neutral). However, counsel for defendant stated during oral argument that an offeror without an extensive record of past performance might be deemed to lack a "history" of delivering high-quality services. *See* Tr. at 88–89. While this ambiguity in the RFP's past-performance

rating scheme does not convert the evaluation to pass-fail, it does reflect yet another instance of a somewhat poorly constructed evaluation scheme. Additionally, such laxity or imprecision in the demarcations of the past-performance rating categories is less than desirable for the fair and transparent assignment of ratings.

26. As discussed *infra,* moreover, the three-level rating scale for past performance cannot be viewed as a compressed or truncated version of the rating scale used for Factors 2 through 5

In *Helicopter Transport Services, LLC*, B–400295, B–400295.2, 2008 CPD ¶ 180, 2008 WL 4510875 (Comp.Gen. Sep. 29, 2008), GAO sustained a protest because the agency had evaluated the most important factor in the evaluation on a two-level scale. GAO held that the use of a compressed scale "effectively neutralized the influence of the most important factor[,]" and rendered that factor less important than the other factors in the evaluation. *Id.* at *3. When the use of different rating scales for different evaluation factors has the effect of changing the relative weight of those factors as set forth in the RFP, the use of different rating scales is contrary to the RFP.

In this case, past performance was the least important non-price factor, so the compression of the rating scale for that factor did not affect the relative weight of the non-price factors as set forth in the RFP. For that reason, the use of a different rating scale for past performance was not inconsistent with the evaluation scheme contained in the RFP.

### b. The Rating Scale for Past Performance Was Not Irrational

In addition to its argument that the rating scale used for past performance was inconsistent with the requirements of the RFP, FirstLine makes the related argument that the scale was arbitrary and capricious, even if it was consistent with the RFP. The court disagrees with that assessment.

FirstLine argues that the integrated assessment contemplated under the RFP requires that all non-price factors be evaluated in accordance with the same scale. Otherwise, according to plaintiff, the government would be unable to compare the proposals by according the ratings the weight assigned to each evaluation factor under the RFP. *See* Tr. at 23 ("In fact, if the government is going to weight and compare and perform an integrated analysis, the government has to use the same rating scale in order to perform

that integrated analysis."). To the extent that plaintiff is arguing that a uniform four-level rating scale is necessary to allow the rational scoring and comparison of proposals in a quantitative manner, that argument fails.

The RFP specifies that Factors 2 through 6 are listed in descending order of importance, but it does not specify the magnitude of the differences between them. For example, the RFP provides that Factor 2 is more important than Factor 3, but it does not state how much more important the former is than the latter. Likewise, the adjectival ratings set forth in the SSP are expressed in relative terms. Because the relationships among the evaluation factors and among the ratings are expressed in relative—rather than absolute—terms, the ratings assigned to the proposals cannot be converted into numerical scores and compared on that basis.[27] Without precise weights for each of the non-price factors and numerical values for each of the adjectival ratings, the proposal evaluations and ratings are not amenable to the type of precise quantitative comparison that plaintiff appears to suggest was required here, regardless of whether all of the factors had been subject to the same rating scale.

The government was free to assign precise weights to the non-price factors and numerical scores to the adjectival ratings, but it was not required to do so. *See* 48 C.F.R. § 15.305(a) ("Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings."); *Network Solutions, Inc.*, B–234569, 89–1 CPD ¶ 459, 1989 WL 240778, at *3 (Comp. Gen. May 15, 1989) (noting that while the government must indicate the relative weight of evaluation factors in the solicitation, there is no requirement that "the precise numerical weights to be used in the evaluation ... be disclosed"). Nor were the SSA or the SSEB required to quantify their best-value tradeoff analysis in that manner. *See* 48 C.F.R. § 15.308 (noting that the required documen-

---

because the past-performance ratings evaluate fundamentally different considerations than the ratings used for the other non-price factors.

**27.** Vernon J. Edwards, *Postscript II: Scoring or Rating in Source Selection*, 23 No. 2 Nash &

Cibinic Report ¶ 2 (January 2009) (noting that because an adjectival rating scale is "ordinal, not interval or ratio, it does not enable a user to determine exactly how much better an exceptional proposal is than an acceptable proposal").

tation of the best-value analysis "need not quantify the tradeoffs that led to the decision"). Because a quantitative comparison of the proposals was not required under the evaluative scheme established by the RFP and the SSP, FirstLine's argument that the use of a uniform rating scale was necessary is without merit.

Additionally, as a general rule, there is no requirement that an agency use the same rating scale for all evaluation factors set forth in the RFP. In *Venture Productions,* B–280872.2, B–280872.3, 98–2 CPD ¶ 150, 1998 WL 886545 (Comp.Gen. Dec. 9, 1998) (citation omitted), for example, GAO denied a protest that was based on the argument that the agency was required to use the same rating scale for past performance as was used for the other evaluative factors:

> The protester also argues that the stated evaluation scheme was violated by the agency's decision to use a separate rating scale for the organizational past performance factor than was used for the other evaluation factors. The protester argues that since there are fewer degrees of gradation in the rating scale for this factor, slight variations in an offeror's past performance were translated into large point differences; however, the protester offers no precedent to support its view that this kind of evaluation approach is improper, or results in an unreasonable result. In fact, we have upheld an agency's use of a different scheme for assessing past performance than was used for assessing other evaluation factors.

*Id.* at *3. In the absence of an express requirement in the RFP that all evaluation factors be rated on the same scale, this court will not disturb the evaluative scheme that was used to assess the offerors' past performance.

Plaintiff also argues that it was irrational for TSA to convert the four-level ratings denoted on the past-performance surveys to the three-level scale that was ultimately used to evaluate the proposals on Factor 6. This argument is based on three faulty assumptions. First, it assumes that the four-level scale used in the telephone surveys was the same four-level scale that was used to evalu-

ate the other non-price factors. Second, it assumes that the past-performance ratings are nothing more than a compressed or truncated version of the technical ratings in the four-level scale. Finally, it assumes that the past-performance surveys for each referenced contract culminated in a single adjectival rating on a four-level scale, which was then converted to a different rating on a three-level scale. None of those assumptions withstands scrutiny.

First, while they have the same adjectival labels, it is not at all clear that the ratings used on the past-performance survey forms are the same ratings used to evaluate Factors 2 through 5. Indeed, there is good reason to believe they are not. The adjectival ratings used to evaluate proposals for Factors 2 through 5 assess the offeror's understanding of the RFP's requirements, whether the offeror's plans are in a final state, the degree of risk associated with the proposal, the proposal's strengths, weaknesses, and deficiencies, and the potential need for government intervention during contract performance. In contrast, the four-rating scale on the telephone survey form appears to be more informal and impressionistic than the defined and systematic ratings used for Factors 2 through 5. The purpose of the ratings used on that form is to determine the overall customer satisfaction of a past-performance reference. There is no requirement that the ratings used in conducting interviews of an offeror's past-performance references be the same as the ratings that are ultimately used to rate that offeror's past performance. *See Maint. Eng'rs v. United States,* 50 Fed.Cl. 399, 420–21 (2001) (rejecting the argument that a procurement was flawed because the adjectival ratings used by respondents on past-performance questionnaires were different than the ratings used to evaluate the offerors' past performance).

Second, an examination of the narrative descriptions of the ratings used for Factors 2 through 5 and those used for Factor 6 demonstrate that the latter are not a compressed or truncated version of the former. As discussed above, the ratings for Factors 2 through 5 assess several issues related to an offeror's understanding of the RFP and the

characteristics of its proposal. The issues encompassed in the adjectival ratings for Factor 6, in contrast, are limited to the extent of the offeror's past experience, the relevance of that experience, and the quality of the services that were performed under past contracts. The two sets of ratings seek to address very different issues and priorities.

Finally, the rating assigned to an offeror on the telephone survey form does not represent its overall rating for past performance. The final rating assigned to an offeror for Factor 6 is based on the ratings from past-performance references, plus responses to fifteen other questions contained on the survey form. In addition, the final rating reflects the evaluators' determination of whether the referenced contracts were highly relevant, relevant, or not relevant.

In short, it does not appear that the past performance of offerors was ever evaluated under the four-level scale used for Factors 2 through 5, so the proposals were never converted from that scale into the three-level scale used for Factor 6. Rather, the first past-performance rating provided by contacted references was just one among many factors that were considered when the PPET evaluated the offerors' past performance. Following the completion of that initial evaluation, each proposal was assigned a final adjectival rating in accordance with the three-level scale set forth in the SSP. There was nothing unreasonable about that process.

### 3. TSA's Past Performance Evaluation Was Not Irrational

■ FirstLine contends that the government's past-performance evaluation was irrational and had the effect of overrating the poor past performance of intervenor and underrating the superior past performance of plaintiff. For the reasons discussed below, this court holds that the government's evaluation of the parties' past performance was not irrational.

The RFP set forth the past-performance information that offerors were required to submit with their proposals:

The Offeror shall provide a contract summary for five (5) contracts either ongoing or completed within the past three years that demonstrates performance similar or relevant to the solicitation performance requirements. Similar or relevant past performance efforts are defined by size, scope, complexity, and contract type.

AR at 133. In addition, the RFP noted that "[o]fferors must provide the above information or affirmatively state that they possess no relevant, directly related, or similar past performance." *Id*, at 134.

The government reserved the right to obtain information from sources other than the contract summaries and references submitted by the offerors. *Id.* at 145. The RFP indicated that the government would "attempt to conduct telephone interviews to assess past performance identified in all Contract Summaries." *Id.* But the government also reserved the right not to contact all of the references submitted by offerors. *Id.* at 134. Under the RFP, the government was required to "utilize the information obtained during telephone interviews to establish/assign the overall ratings." *Id.* at 145. The purpose of the required telephone interviews was to determine whether the listed references were satisfied with the past performance of the offerors. *Id.* That assessment of customer satisfaction was to consider overall satisfaction, contract management and performance, scheduling and timeliness issues, technical expertise, and resource management and staffing. *Id.*

The RFP explained that the past-performance evaluation is designed to "determine the likelihood that the Offeror will be able to successfully perform the requirements identified in the Solicitation." AR at 144. The required evaluation involved an assessment of the following factors:

Relevance of Past Performance: In assessing relevance of past performance, the Government will consider relevant contracts as those contracts that are ongoing or completed in the last three years having comparable level of size, scope, and complexity to the requirements of the solicitation.

Performance: In assessing performance, the Government will consider the Offeror's demonstrated or proven ability to meet

performance requirements, effectively manage resources, and achieve consumer satisfaction.

*Id.* at 144–45 (bullets omitted). Under the RFP, in other words, the government was required to determine whether the past-performance contracts submitted by the offerors were relevant and to assess the quality of the offerors' performance with respect to those contracts.

The SSP set forth the rating scale to be used by the PPET in evaluating the past performance of the offerors:

Acceptable The offeror's past performance record indicates that they have a history of delivering high quality services in the areas described in the RFP in an environment of same or similar size, scope and/or complexity.

Neutral The offeror's past performance record is not extensive in the areas described in the RFP or the offeror does not have past record of performing the requirements described in the RFP in an environment of same or similar size, scope and/or complexity.

Unacceptable The offeror's past performance record does not demonstrate successful delivery of services described in the RFP in an environment of same or similar size, scope and/or complexity.

*Id.* at 458. The RFP and the SSP both provided that offerors without any relevant past-performance references must be assigned a "Neutral" rating. *Id.* at 145, 454.

FirstLine submitted summaries and references for [ ] contracts. *See* AR at 1054–57. The first is [ ].

Akal submitted summaries and references for [ ] contracts. *See id.* at 1006–14. The first is [ ].

The government interviewed the references for some, but not all, of the past-performance contracts submitted by the parties. *See id.* at 1015–53, 1058–89. Notably, there is no evidence in the administrative record that the government contacted the references for the contracts submitted by Akal [ ]. Following those interviews, the PPET assigned both parties a rating of [ ] for past performance. *Id.* at 1502.

FirstLine argues that the PPET overrated intervenor's past performance, and that intervenor should have received a rating of [ ] for Factor 6. However, the court concludes that the past-performance rating assigned to Akal was not irrational and is therefore entitled to deference from this court.

■■■ "When the Court considers a bid protest challenge to the past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'" *Univ. Research Co. v. United States,* 65 Fed.Cl. 500, 505 (2005) (quoting *Gulf Grp., Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004)); *see also Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed.Cl. 488, 513 (2009) (noting that the past-performance evaluations of agencies are entitled to deference, and that the court will not second-guess those evaluations). In reviewing FirstLine's challenge to the past-performance ratings assigned to the proposals, the court must be mindful of the significant deference to which the government's evaluations are entitled.

FirstLine emphasizes that Akal "has *no* experience as an SPP contractor." Pl.'s Mot. at 9. There is no requirement in the RFP, however, that a successful offeror possess past experience as an SPP contractor. Given the small number of airports that participate in the SPP, such a requirement would effectively limit the competition for SPP contracts to the small number of incumbents at those airports. Because prior experience as an SPP contractor was not a requirement or a stated evaluation factor under the RFP, the government was not required to downgrade intervenor's past-performance rating on that basis.

Next, plaintiff notes that [ ] of the [ ] contracts submitted by intervenor were performed by a subcontractor that will perform no more than [ ] percent of the work under the MCI contract, *see* AR at 1305, and asserts that those references should have been afforded little or no weight in the evaluation process. As noted by the government, however, there is no evidence in the administrative record that the PPET evaluators contacted the references for those contracts, or

that those contracts played any role in the rating assigned to intervenor for past performance. Nor was the government required to contact those references. *See id.* at 134 (stating that TSA reserves the right to not contact all past-performance references).

In addition, FirstLine appears to question the relevance of the remaining contracts submitted by intervenor. Plaintiff notes that [ ] of those contracts were for security work performed not at an airport, [ ], and the remaining contract was for [ ]. However, the PPET determined that those contracts were relevant, and the court concludes that the government's determination in that regard was not irrational.

[ ]. The PPET determined that the contract was relevant, *Id.* at 1015, and the reference for the contract assigned intervenor a rating of [ ] for overall satisfaction, *Id.* at 1016, 1020.[28] [ ]. The PPET evaluators determined that the contract was relevant, *Id.* at 1023, and the reference for the contract assigned intervenor a rating of [ ] for overall satisfaction, *Id.* at 1024, 1027.[ ], the PPET evaluators nonetheless determined that the contract was "highly relevant" for purposes of assessing intervenor's past performance. *Id.* at 1030. In addition, the reference for that contract assigned intervenor a rating of [ ] for overall satisfaction. *Id.* at 1031, 1034.

Based on the assessments of the PPET evaluators and the past-performance references submitted by intervenor, the court cannot conclude that the evaluation of intervenor's past performance was arbitrary or capricious. Because the rating assigned to intervenor's proposal for Factor 6 was not irrational, FirstLine's challenge to that rating must fail.

FirstLine also argues that its past performance was underrated by the PPET. However, plaintiff was assigned the highest possible rating for past performance, and the court has determined that the three-level rating scale applied by the PPET was not irrational. In short, FirstLine's argument

that it should have received a higher rating for its past performance is without merit.

The court cannot conclude that the government's assessment of intervenor's past performance was arbitrary, capricious, or contrary to law. The court also must reject FirstLine's argument that its past-performance rating was too low. Because FirstLine's challenges to the past-performance evaluations amount to no more than mere disagreement with them, its protest cannot be sustained on that basis.

### 4. The Adjectival Ratings Assigned to the FirstLine Proposal Are Not Irrational

 FirstLine asserts that the technical ratings assigned to its proposal were inconsistent with the narrative evaluation of its proposal, as well as the descriptions of those ratings as set forth in the SSP. While the TET assigned the proposal a rating of [ ] on Factors 2 through 4, FirstLine argues that the TET's discussion of the proposal in its report is more similar to the narrative description for an [ ] rating with respect to all three of those factors under the SSP. For the reasons discussed below, the court holds that the ratings assigned to the FirstLine proposal are not irrational.

 The assignment of technical ratings is a matter that is within the broad discretion of the procuring agency, and this court will not intrude into that area in the absence of truly irrational conduct on the part of the agency. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) (noting that matters such as technical ratings "involve discretionary determinations of procurement officials that a court will not second guess"); *Femme Comp,* 83 Fed.Cl. at 740 ("A protestor's mere disagreement with an evaluation does not provide an adequate basis to overturn the agency's decision."); *DynCorp Int'l LLC v. United States,* 76 Fed.Cl. 528, 537 (2007) ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."); *Beta Analytics Int'l, Inc. v.*

---

**28.** Intervenor asserts that it received a rating of [ ] from the past-performance reference for this contract. Akal's Mot. at 6, 17. There is, however, no [ ] rating on the past-performance survey

form. *See* AR at 1016, 1020. Akal received a rating of [ ] for its performance under this contract. *Id.*

*United States,* 67 Fed.Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations.").

The narrative description for each of the four adjectival ratings used for Factors 2 through 5 are composed of five elements. The required elements for the ratings of [ ] and [ ] are set forth below.

| [ ] | [ ] |
| --- | --- |
| [ ] | [ ] |
| [ ] | [ ] |
| [ ] | [ ] |
| [ ] | [ ] |
| [ ] | [ ] |

AR at 458. As discussed below, the evaluation of the FirstLine proposal falls somewhere between the descriptions of these two ratings.[29] The court will not second-guess the judgment of the agency by holding that the proposal is closer to one than the other.

In its motion for judgment on the administrative record, FirstLine presents selected language from the evaluation of its proposal for Factor 2 and some of its subfactors, and argues that the language is almost identical to the language set forth in the SSP's definition of an [ ] proposal. Pl.'s Mot. at 26–28. FirstLine also argues that the language contained in the evaluation of its proposal for Factors 3 and 4 is also consistent with an [ ] rating." Pl.'s Reply at 12–13. For those reasons, FirstLine argues that the assignment of lower technical ratings to its proposal was arbitrary and capricious. That argument is without merit.

Under the SSP, an [ ] proposal must be [ ], while a proposal that is merely [ ] may [ ]. The narrative evaluation of the FirstLine proposal suggests that the ratings assigned to the proposal for Factors 2 through 4 were not irrational:

[Factor 2] [ ]

. . . .

[Factor 3] [ ]

. . . .

[Factor 4] [ ]

*Id.* at 1482, 1489, 1491 (emphasis added). Because these potential benefits of the First-Line proposal are described in terms of possibility, rather than probability, the evaluations are consistent with a rating of [ ] under the SSP.

The court cannot conclude that the technical ratings assigned to the FirstLine proposal were arbitrary or capricious. Thus, this protest cannot be sustained on that basis.

### 5. The Price Evaluation Conducted by the PET and Adopted by the SSEB Was Not Irrational

■ FirstLine specifically argues that Akal's proposal should have raised flags because of its failure to include adequate insurance costs in its proposal. Pl.'s Mot. at 28–29. Plaintiff asserts that the government "failed to evaluate this aspect of Akal's Proposal." *Id.* at 29. Akal argues that plaintiff misconstrues the RFP and that an offeror was not obliged to allocate certain levels of insurance in its contract price. Akal's Mot. at 20–21. The government argues that FirstLine is suggesting that a risk analysis was required by the RFP, but there is no such requirement in the RFP. Def.'s Mot. at 24. Plaintiff nonetheless insists in its reply brief that TSA should have considered the risks inherent in Akal's discussion of insurance costs in its proposal, yet failed to do so. Pl.'s Reply at 20 n. 9. The court concludes, on this record, that the agency's price evaluation of Akal's proposal was consistent with the requirements of the RFP, as regards the requirements for insurance.

Plaintiff's more general argument appears to be that a risk analysis was required by the RFP and the FAR, and that the risks in Akal's proposal were not adequately evaluated by the PET and the SSEB. *See* Pl.'s Mot. at 28–29 (alleging that the administrative record demonstrates that TSA did not conduct "a risk analysis of proposals in accordance with FAR guidelines"). Furthermore, although plaintiff's counsel assured the court that it is not plaintiff's position that a price

**29.** Counsel for plaintiff conceded as much during oral argument. *See* Tr. at 13.

realism analysis was required in this procurement, Tr. at 35, plaintiff referred to "TSA's price realism analysis" in its reply brief. Pl.'s Reply at 20; *see also* Pl.'s Mot. at 31 (citing precedent discussing the impact of an inaccurate government estimate on a price realism analysis). At oral argument, plaintiff's counsel stated that

It's not our position ... that an actual price realism phase of this procurement had to occur, but in assessing risk posed by a particular approach versus another, considerations approximating a price realism analysis do come into play.

Tr. at 35.

The court agrees with defendant that this procurement required neither a risk analysis nor a price realism analysis, as those terms are defined in the FAR. *See* Def.'s Mot. at 23–25. To the extent, however, that plaintiff contends that the risks in Akal's proposal were not given adequate weight in the SSEB's best value analysis, the court cannot disagree. That issue has previously been addressed at some length in this opinion, and needs no further discussion here.

As a final note about the price evaluation conducted by TSA in this procurement, the court turns to the PET's analysis of initial and final proposals. The PET found that the initial proposals submitted by Akal and FirstLine were "fair, reasonable and balanced." AR at 1524. These proposals ranged in price from $[ ] for Akal to $[ ] for First-Line. *Id.* The reasonable price range, therefore, was quite broad, with more than $[ ] separating these two fair, reasonable and balanced offers. Furthermore, FirstLine's initial price, more than [ ] than the IGCE, was deemed to be fair, reasonable and balanced, using the same three measures later employed to evaluate FPRs from Akal and FirstLine. *Id.*

After FirstLine's FPR subtracted almost $[ ] from its initial price, FirstLine's final price was only [ ] the IGCE. AR at 1526, 1546. FirstLine's FPR was again evaluated as fair, reasonable and balanced. *Id.* at 1526. The SSEB noted that "FirstLine's [better] proposal offers an approach expected to require less Government intervention than

AKAL's approach, with reduced operational risk." *Id.* at 1549.

According to the PET's price evaluation results, FirstLine's FPR was almost $[ ] below what had been identified as a price that was within the range of fair and reasonable prices for the contract. Instead of choosing FirstLine's proposal, however, TSA chose Akal's proposal "which also offered an acceptable level of technical competence." *Id.* As previously discussed, although the SSEB stated that it "did not make award on a lowest-cost technically acceptable basis," *id.*, the record of the PET's price evaluation of proposals supports the court's finding that this contract award was essentially made on a lowest-cost technically acceptable basis, not pursuant to the best-value determination required by the RFP.

## VII. Significantly Flawed Award Decision and Prejudice to the Protestor

The court has closely examined this procurement and found: (1) that the SSEB failed to perform a best-value tradeoff analysis as required under the RFP; and (2) that the SSA failed to exercise and document her independent judgment in accordance with FAR 15.308. These procurement errors are significant, and the court finds that the decision to award this contract to Akal was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote*, 365 F.3d at 1350–51 (quoting *Advanced Data Concepts*, 216 F.3d at 1057–58). These errors are too significant to disregard as harmless or *de minimis*.

The parties dispute whether FirstLine was prejudiced by the procurement errors committed by the SSEB and the SSA. The question is not whether FirstLine has proved that it would have received the award but for these procurement errors. *See, e.g., Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.") (citations omitted). Rather, the question here is whether FirstLine has shown that it had a substantial chance of being awarded the MCI contract if the demonstrated procurement errors in this

case had not occurred. *Linc Government Services,* 96 Fed.Cl. at 696 ("[T]he plaintiff must show that it would have had a substantial chance of being awarded the contract but for the combined impact of any agency decisions *adjudged* to be unlawful.") (emphasis in original).

■ As discussed above, this was a fundamentally flawed source selection process. The SSEB irrationally minimized the significant technical differences between the proposals submitted by plaintiff and intervenor, which had the effect of elevating the relative importance of price in the evaluation of those proposals. Based on its irrational determination that the FirstLine proposal was only "moderately better" than the competing proposal submitted by intervenor, the SSEB then recommended intervenor's proposal on the basis of its lower price and technical acceptability in contravention of the RFP. Instead of exercising her independent judgment as required under FAR 15.308, the SSA adopted the recommendation of the SSEB without setting forth any substantive explanation for the business judgments or trade-offs justifying her decision. The court is satisfied that FirstLine had a substantial chance of award, and was prejudiced by the procurement errors discussed in this opinion. Because FirstLine has prevailed on the merits, the court turns to the factors governing injunctive relief.

## VIII. Injunctive Relief Factors

As the Federal Circuit has stated,

In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citation omitted). Here, plaintiff has succeeded on the merits. Thus, the first injunctive relief factor favors enjoining TSA's contract award to Akal.

■ This court, in many cases, has found that the loss of the opportunity to fairly compete for a contract constitutes irreparable harm. *See, e.g., Hosp. Klean of Tex., Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protestor] will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (citations omitted); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000) (holding that the "potential loss of valuable business" may constitute irreparable harm). In this suit, FirstLine specifically asserts that the MCI contract accounts for approximately [ ] percent of its revenues, a figure that is not challenged by defendant or intervenor, and that FirstLine would cease to exist as a business entity unless an injunction issues in this case. Pl.'s Inj. Mot. at 2–3. Plaintiff has demonstrated irreparable harm. *See, e.g., Asia Pac. Airlines v. United States,* 68 Fed.Cl. 8, 26 (2005) (holding that where a protestor's business survival was unlikely absent an injunction, the protestor had shown irreparable harm). Thus, plaintiff has satisfied the second criterion for receiving a permanent injunction.

■ As to the balance of hardships, the court concludes that the hardship to be suffered by FirstLine in the absence of an injunction would be greater than the hardships to be sustained by intervenor and the government if an injunction were to issue. As noted above, the MCI contract accounts for approximately [ ] percent of FirstLine's revenues, and is vital to FirstLine's survival. Intervenor has not addressed the harm it would experience if an injunction were to issue, and the court, on this record, views the harm to FirstLine, in the absence of an injunction, as outweighing any harm to Akal if the contract award is enjoined.

As to the harm the government will sustain if the contract award is enjoined, defendant merely states that "ordering reprocurement would unnecessarily intrude upon the contracting agency's discretion." Def.'s Mot.

at 40. The court disagrees. This court must act to prevent an arbitrary and capricious contract award which violates the fundamental protections afforded bidders on government contracts. The balance of harms favors FirstLine here, where the government has failed to articulate any specific harm that would flow from this court's injunction. *See, e.g., Wetsel–Oviatt Lumber Co. v. United States,* 43 Fed.Cl. 748, 753–54 (1999) (holding that "the balance of hardship tips in favor of the plaintiff where, as here, the government fails to articulate any harm that it will endure if the injunction is granted") (citations omitted). Thus, the balance of hardships factor also favors an injunction in this instance.

█ Finally, the court holds that a permanent injunction is in the public interest in this case because it will promote full and open competition in the procurement process and will preserve confidence in the fairness of government contract awards. *See Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted). In addition, the public interest in a fair best-value procurement is particularly compelling in this case, given the critical nature of the services to be provided under the MCI contract. The government, assuming that plaintiff failed to succeed on the merits, argues that "FirstLine has failed to show that TSA compromised the integrity of the procurement system," Def.'s Mot. at 39, but the court must disagree. This contract award did not conform to the requirements set forth in the RFP and the FAR for a best-value procurement, and for this reason the award to Akal was fundamentally unfair. Because the public interest, and all of the injunctive relief criteria favor an injunction in this instance, the court enjoins performance of the contract by Akal and directs TSA to amend or cancel the RFP.

30. Nor can the court approve Akal's comment in its reply brief, that "if FirstLine were successful on any of its … protest grounds, TSA would only be required to reevaluate the [existing] final

## IX. Injunctive Relief Tailored to the Circumstances

The court has carefully considered the types of injunctive relief that might be appropriate in the circumstances of this procurement, given that the contract award to Akal cannot stand. Plaintiff suggests that the court order TSA to award the contract to FirstLine. Pl.'s Mot. at 40. As this court has repeatedly held, however, it will not intrude upon the contracting authority of the United States. *See, e.g., MVM, Inc. v. United States,* 46 Fed.Cl. 137, 144 (2000) ("The Federal Circuit has instructed that usually a court should not make a contract for the [United States and a private party].") (citations omitted); *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 461 (1997) ("The court … should not select a contractor or award specific performance of a contract.").

In the alternative, plaintiff requests that the court "direct TSA [to] conduct new discussions with FirstLine and Akal, request best and final offers, and award the contract to the offeror that represents the best value to the Government in accordance with the RFP's evaluation criteria and applicable law." Pl.'s Mot. at 40. Although this solution might result in an improved best-value determination, for, in the court's view, any best-value determination would be an improvement over a non-existent one, plaintiff's suggested relief does not address the serious flaws contained in the RFP. These errors in the solicitation, which most seriously concern the price evaluation of proposals, would inexorably lead to a flawed best-value analysis.[30]

Instead, the court draws guidance from Akal's discussion of *Titan,* a GAO decision which was referenced in an earlier section of this opinion. As intervenor notes, when a protest is sustained on other grounds and the government will likely resolicit the requirement, it is inefficient to allow obvious and serious errors to recur in the resolicitation, even if those errors were not timely raised in the protest currently under review:

revised proposals [submitted by FirstLine and Akal]." Akal's Reply at 12. This solution, too, ignores the flaws in the RFP.

[B]ecause the GAO's decision on other protest grounds required the Army to reopen, reevaluate, and re-select a new awardee, it made little sense not to also correct the evaluation scheme so that it would permit the Army to consider such extra-procurement costs. This makes sense from the prospective of judicial economy—once the Army reopened the procurement to correct for the other errors identified by the GAO, the protestor could then file a timely protest to the evaluation terms because it would be prior to [the] time when final offers were due. Rather than require the protestor to file a subsequent (and now timely) protest on that issue, it was more efficient for the Army to address that matter on remand.

Akal's Reply at 11–12. Similarly, in this procurement, the court concludes that there is no sense in perpetuating an illogical and inaccurate price evaluation scheme that ignores out-of-contract transition costs and that skews a price evaluation of proposals in favor of the proposal offering the least value to the government.

For this reason, the court cannot simply order TSA to re-open discussions, solicit revised final proposals, and conduct a best-value determination based on a fundamentally flawed price evaluation scheme in the RFP. The court notes, too, that the price evaluation scheme is not the only flaw in the RFP. The best-value tradeoff analysis described in the RFP fails to conform to FAR 15.101–1(b)(2) and FAR 15.304(e), as discussed in note 15 *supra.* These distinct flaws must be corrected in any resolicitation of the contract requirements at MCI.

Thus, TSA has two options which would permit the government to obtain security screening services at MCI under the SPP program after cancellation of the award to Akal.[31] First, TSA may choose to amend the solicitation to correct the price evaluation scheme errors and the FAR violations noted in this opinion. TSA would be obliged to review its proposed amendment under the guidelines set forth in FAR 15.206(e), to ensure that the amendment was permitted under the FAR. Both Akal and FirstLine, the sole offerors remaining in the competitive range, would be notified of the amendment to the solicitation, be engaged in discussions with TSA, and be encouraged to submit revised final offers based on the amended solicitation and those discussions. TSA would then conduct a best-value determination in accordance with the amended RFP, the FAR, and the principles outlined in this opinion.[32]

In the court's view, this approach remedies the errors in this procurement and does not deny FirstLine and Akal the competitive advantage they obtained by being included in the competitive range. Amendment of the solicitation also would minimize the time required to obtain a valid contract award. This court has considered solicitation amendment to be fitting relief in appropriate bid protest circumstances. *See, e.g., Mangi Envtl. Grp., Inc. v. United States,* 47 Fed.Cl. 10, 20 (2000) ("The court orders that the Forest Service either (1) amend the solicitation to inform all offerors who were within the competitive range that it relaxed the solicitation's requirements pursuant to FAR § 15.206 or (2) resolicit the contract and consider only those bids that are technically compliant."); *MVM,* 46 Fed.Cl. at 145 ("Accordingly, the Court orders that the agency shall amend the solicitation to inform all offerors who were within the competitive range that it eliminated the Northern District of Florida. The solicitation shall request new bids from all offerors within the competitive range."). The court notes, too, that the amendment required here does not appear to offend FAR 15.206(e), although that determination is within the discretion of TSA. *See, e.g., Argencord Mach. & Equip., Inc. v. United States,* 68 Fed.Cl. 167, 174 (2005) ("The amendment here was clearly not so substantial as to exceed what offerors reasonably could have anticipated in a procurement for these parts. The amendment simply authorized an alternate material

---

**31.** The court expresses no opinion as to the legality of pursuing other short- or long-term options for maintaining security screening services at MCI.

**32.** The Clerk's Office of this court would refer any subsequent protest of a contract award pursuant to the amended RFP to the undersigned.

which met the Army's testing requirements."); *Gov't Contract Servs. Co.*, B–294367, 2004 CPD ¶ 215, 2004 WL 2389912, at \*2 (Comp.Gen. Oct. 25, 2004) ("Our review of the record confirms that the challenged amendment falls outside of [FAR 15.206(e)] as it is neither substantial nor beyond that which prospective offerors reasonably could have anticipated."); *The N.J. & H St. Ltd. P'ship*, B–288026, B–288026.2, 2001 CPD ¶ 125, 2001 WL 812307, at \*3 (Comp.Gen. July 17, 2001) (holding that because the challenged solicitation amendment was not substantial and did not offend FAR 15.206(e), an offeror in the competitive range such as the awardee was legitimately permitted to submit a revised proposal based on the amendment).

If amendment of the solicitation is not pursued by TSA, the only other option permitted by the procurement errors noted in this opinion is complete reprocurement of the solicitation requirements. What course of action TSA chooses to pursue after contract award is cancelled in order to maintain security screening services at MCI is not for this court to decide. The court notes, however, that any revisions to the current solicitation, source selection plan and TSA's procurement processes should be substantive, not superficial.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion to Supplement the Administrative Record, filed June 24, 2011, is **DENIED;**

(2) Defendant's Motion to Strike, filed July 5, 2011, is **GRANTED,** and the Clerk's Office is directed to **STRIKE** Exhibit A and Exhibit B to the Statement of Facts and Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Administrative Record, filed June 24, 2011;

(3) Plaintiff's Motion for Judgment on the Administrative Record, filed June 24, 2011, is **GRANTED;**

(4) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, filed July 5, 2011, are **DENIED;**

(5) Plaintiff's Request for Permanent Injunctive Relief, filed June 24, 2011, is **GRANTED** as follows:

The United States, by and through the Department of Homeland Security, Transportation Security Administration, its officers, agents, and employees, is hereby

**PERMANENTLY RESTRAINED AND ENJOINED** from awarding the contract to Akal Security, Inc. based on the Source Selection Authority's source selection decision, dated March 17, 2011, for Contract No. HSTS03–11–C–SPP052, and is further directed to

**CANCEL** or **AMEND** Solicitation No. HSTS03–10–R–SPP032, in accordance with the principles set forth in this opinion;

(6) The Clerk's Office is directed to **ENTER** final judgment in favor of plaintiff;

(7) On or before **September 9, 2011,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter;

(8) The Clerk's Office is directed to **ASSIGN** any related protest regarding a solicitation of proposals or the award of a contract for security screening services at Kansas City International Airport to the undersigned; and

(9) Each party shall bear its own costs.